EVANS v. TILLMAN.

1. STATUTE—INTENTION.—An act of the legislature, authorizing State officials to refund the debt of the State, must be construed, in all of its provisions, together, so that the intent may be ascertained and given effect.

2. IBID.—IBID.—PUBLIC DEBT—FACE VALUE.—A statute passed December 22, 1892, authorized the governor and State treasurer, in refunding the State debt which matured July 1, 1893, to issue new bonds bearing date January 1, 1893, with interest running from date, and to sell the new issue at not less than "par or face value," and to apply the proceeds to the payment of the maturing debt. Other sections of the statute used the words, "face value," in the sense of the principal of the consols, without accrued interest; and these State officers were further authorized "to offer and pay a commission to parties placing said bonds and stock." *Held*, that the governor and State treasurer could sell the new issue of bonds after January 1, ˙893, at par flat—that is, for the amount stated on the face of the new bonds, without accrued interest; and this court declined to enjoin a contract made by them with certain purchasers to sell at this price. MR. CHIEF JUSTICE McIVER *dissenting*.

This was a petition by John Gary Evans, a taxpayer, presented to this court in its original jurisdiction, to enjoin B. R. Tillman, governor, and W. T. C. Bates, State treasurer, to carry out a contract made by them with the Baltimore Trust and Guarantee Company. The terms of this contract, in all of its material particulars, are stated in the dissenting opinion of the Chief Justice.

*Mr. John Gary Evans,* for the petition.

*Mr. Townsend,* attorney general, and *Mr. J. N. Steele,* contra.

January 19, 1893.   The following order was filed:

This is an application addressed to the court in the exercise of its original jurisdiction, for an injunction to restrain the defendants from entering into a contract for the sale of the 4½ per cent. bonds of this State (a copy of which contract is appended to the proceedings in this case), upon the ground that such a proposed contract is not authorized by the terms of "an act to provide for the redemption of that part of the State debt known as the brown consol bonds and stock by issue of other bonds and stock," approved 22d day of December, A. D. 1892.

In the judgment of the majority of this court, based upon the consideration of the several sections of the act in question, the contract is not in excess of the power given the defendants by the said act when its provisions are construed together, and hence there is no ground for the injunction prayed for.

It is, therefore, ordered, that the prayer of the petitioner be refused, and the petition be dismissed.

An opportunity at an early day will be used to prepare and file an opinion stating more at large the reasons influencing the judgment of a majority of this court in rendering this conclusion.                                S. McGOWAN, A. J.
                                                      Y. J. POPE, A. J.


I regret very much indeed to say that I am unable to concur in the conclusion reached by a majority of this court, and will take the earliest opportunity which the pressure of official duties will permit, to give in writing the grounds upon which my dissent is based.                    HENRY McIVER, C. J.

February 23, 1893.   The opinion of the court was delivered by

MR. JUSTICE McGOWAN.   This was a sworn petition filed in the original jurisdiction of this court by John Gary Evans, stating that he is a citizen and taxpayer of the State of South Carolina, and that B. R. Tillman is governor and William T. C. Bates treasurer of said State, respectively.

2. That at the last session of the legislature of said State, an act was passed, entitled "An act to provide for the redemption of that part of the State debt known as the brown consol bonds and stocks, by issue of other bonds and stocks." That among other and various provisions, section 6 of said act reads as follows: "That the governor and State treasurer are hereby authorized and instructed to sell the issue of bonds herein provided for at not less than par or face value, and the proceeds thereof shall be applied to the payment of the consolidated bonds and certificates of stocks, commonly called brown consols, and to no other purpose." See act of 1892, 21 Stat., 24.

3. That your petitioner has been informed by the governor and treasurer aforesaid, and he believes the same to be true, that they have entered into, or are about to enter into, a contract with parties unknown to petitioner, which contains, among other stipulations, the following, to wit: "The said bonds and stocks so purchased shall bear date January 1, 1893, and shall carry interest from January 1, 1893, payable semi-annually. They shall be sold by the parties of the first part, and purchased by the party of the second part, at par flat—that is to say, nothing additional shall be paid for any interest which may have accrued at the time of delivery," &c. (See copy of contract in the record.)[1]

4. That deponent is informed that said contract is without authority of law, as provided in the act aforesaid, in that the governor and treasurer are not authorized, under the terms of said act, permitting said bonds to be sold at par or "face value," to sell the same for less than principal and accrued interest.

Wherefore petitioner prays that a writ of this court do issue, requiring the said B. R. Tillman, governor, and W. T. C. Bates, treasurer, as aforesaid, to appear and show cause why they should not be perpetually enjoined, &c.

The parties were summoned before the court, and made return, admitting the material facts, but demurring that the allegations were not sufficient to authorize the court to grant the injunction prayed for.

---

[1] Also fully stated in the dissenting opinion of the Chief Justice.

The State, in her sovereign capacity, is not complaining, but a taxpayer, who alleges that the aforesaid agents of the State are about to exceed the powers granted to them by the act referred to. No other point was suggested or argued. When an agency is created by a written instrument, and grows wholly out of it, the nature and extent of the authority must be ascertained from the instrument itself. Here the principal is the State of South Carolina, and the act of the legislature is, as it were, the power of attorney. In giving interpretation to the refunding act, consisting as it does of many various provisions in the same act, and upon the same general subject, they must all, as far as practicable, be construed together, in order to ascertain the intention, which must control. In his interpretation of statutes, section 35, Mr. Endlich says: "It is an elementary rule that construction is to be made of all the parts together, and not of one part only by itself. A survey of the entire statute is almost always indispensable, even when the words are the plainest, for the true meaning of every passage is that which best harmonizes with the subject and with every other passage of the act."

In the effort to reach the true construction of the redemption act, the date is not without significance. It was ratified and became a law on December 22, 1892, only ten days before January 1, 1893. At that time it could not be foreseen when the redemption could be effected. It might be immediately, and in that case there would be no interest, as the bonds by the act itself were to bear interest only from "their issue." This was the situation when the act passed, containing the words "face value" of the bonds, and the question now is, what the framers of the act intended by the expression? As I understand it, that question in fairness must be determined, not by constructions which may have been given elsewhere, and under different circumstances, but by the redemption act itself, which considered as a whole is the law of the case. Thus considered, it is suggested with some confidence that the expression "face value" was used in this act to express the idea of *denomination, the amount,* printed on the face of the bonds referred to.

The precise expression "face value" occurs five times in the

16—38

act—twice in section 1, and in sections 6, 8, and 15. (1) In the first part of the first section, where direction is given as to the number of blank bonds to be prepared in order to cover the whole issue, it reads: "shall cause to be prepared a sufficiency * * * as will provide for a total issue of an amount (face value) in the aggregate," &c. (2) And in further directing as to the character of the new bonds, the latter part of the same section proceeds as follows: "said bonds to be of the denominations of $500 and $1,000, and said certificates of stock to have their respective 'face values' left blank, so that the same may be filled as may be most convenient," &c. Now we suppose that there can not be the least doubt, that in both these instances "face value" meant the arithmetical number printed on the face of the bonds and certificates, and nothing else.

Section 15 provides: "That the holders of the South Carolina four per cent. bonds, issued for the redemption of the brown consols, shall have the right to surrender the said four per cent. bonds to the State treasurer, and to receive in exchange therefor brown $4\frac{1}{2}$ per cent. bonds of equal 'face value' as provided for in this act." This reference can not be to section 6 of the act, which makes no allusion to the exchange of bonds; but it doubtless refers back to section 8, which does provide for the exchange of the $4\frac{1}{2}$ per cent. bonds, and in doing so is still more explicit as to the sense in which "*face value*" is used. It is as follows: "That the State treasurer be, and he is hereby, authorized and required to receive from the purchaser of the $4\frac{1}{2}$ per cent. bonds, who may surrender before the first day of July, 1893, all coupon bonds and all certificates of stock, commonly known as 'brown consols,' tendered by them, and shall thereupon, in exchange for, and in lieu of, said bonds and certificates of stock so surrendered, issue to said holders other coupon bonds and certificates of stock of equal '*face value*' with those so surrendered, and of the kind, class, and description, the issue of which is provided for in this act. Or the said treasurer may issue to such holders as may require it, all bonds or all stocks, or part bonds and part stocks, of said authorized issue in making such exchange; and further, at the time of such surrender and exchange, the said treasurer shall pay to

the holder of said bonds and certificates of stock (*i. e.*), the purchaser of the new $4\frac{1}{2}$ bonds *in cash*, the difference in interest from the date of exchange or from the last interest period, to wit, January, 1893, up to and including the maturity of said bonds and stocks, that is to say, $1\frac{1}{2}$ per cent. per annum interest," &c.

The foregoing section is part and parcel of the redemption act itself, and it will be observed that the identical phrase, "face value," recurs again, in *the sense* that the bonds referred to are ready for exchange when they are of "the same *kind, class, and description,*" without any reference to interest in arrear, except to make provision at once for its payment in cash. It is true, that the two last two sections referred to are dealing with exchanges, and not sales of bonds; but it must be kept in mind that the purpose is merely to ascertain *the sense* in which the words "face value" were used in the different provisions of the act, and, for that purpose alone, there is no reason why reference may not be made to such sections, as well, if not with better success, than to any other. This repeated and reiterated use of the identical words, under the different circumstances described, would seem to be a direct declaration, or, indeed, definition, of its true intent and meaning, wherever found in the act; especially as there is another rule of interpretation, which declares that "words are presumed to be used in *the same sense* throughout a statute," &c.

But, be that as it may, it is certain that we must take the redemption act as we find it, which was manifestly passed for the purpose of *effecting a speedy funding* of the debt; and the consideration of its different provisions together shows the true intention, which must prevail, and discloses the unmistakable fact that the largest discretionary powers were granted to the agents, who were entrusted with the conduct of the business, including "authority," in order to have the bonds promptly placed, to offer and pay a commission to parties placing them, which is practically without limit.

After as careful consideration as was allowed by the press of business, it seems to me that, inasmuch as the various provisions of the redemption act indicate that the legislature intended to confer large powers and wide discretion upon its

agents, chosen to carry out its provisions, we can not, in a matter of such gravity, say that a case has been made for a perpetual injunction. And, as that was the only matter submitted, of course nothing beyond it is considered.

An order refusing the injunction has already been filed.

MR. JUSTICE POPE concurred.

MR. CHIEF JUSTICE MCIVER, *dissenting.* This is an application addressed to this court, in the exercise of its original jurisdiction, instituted by the plaintiff, as a citizen and taxpayer of this State, to enjoin the defendants from executing a contract (a copy of which accompanies the proceedings) for the sale of the bonds authorized to be issued by an act of the General Assembly of the said State of South Carolina, entitled "an act to provide for the redemption of that part of the State debt known as the brown consol bonds and stocks by issue of other bonds and stocks," approved the 22d day of December, A. D. 1892. The ground upon which the application is based is that, by the express terms of the sixth section of said act, the defendants are "authorized and instructed to sell the issue of bonds herein provided for at not less than par or face value," and the plaintiff claims that, by the terms of the contract in question, the said bonds will be sold at less than their par or face value, and hence said contract is without authority of law, and the restraining order of this court is asked for, to prevent such an alleged unauthorized sale of said bonds. So that the question presented for the decision of this court, is whether the terms of sale provided for in said contract are within, or in excess, of those authorized and required by the provision of the act above mentioned.

The sixth section of that act reads as follows: "The governor and State treasurer are hereby authorized and instructed to sell the issue of bonds herein provided for at not less than par or face value, and the proceeds thereof shall be applied to the payment of the consolidated bonds and certificates of stock, commonly called brown consols, and to no other purpose." This provision, it seems to me, plainly forbids the sale of the new $4\frac{1}{2}$ per cent. bonds, authorized to be issued under that act,

at less than "par or face value," and the inquiry is narrowed down to the question whether the said contract provides for a sale at less than "par or face value?"

The contract purports to be an agreement between B. R. Tillman, as governor, and W. T. C. Bates, as treasurer, of the State of South Carolina, who are designated as parties of the first part, and The Baltimore Trust and Guarantee Company of Baltimore, who is designated as the party of the second part, for the sale by the parties of the first part to the party of the second part of two million dollars of the bonds and stock bearing interest at the rate of four and one-half per cent. per annum, authorized to be issued by the act above referred to, "upon the following terms and conditions, that is to say: The said bonds and stock so purchased shall bear date 1st January, 1893, and shall carry interest from January 1, 1893, payable semi-annually; they shall be sold by the parties of the first part, and purchased by the party of the second part, at par flat—that is, nothing additional shall be paid for any interest which may have accrued at the time of the delivery; the purchase money of said bonds and stock shall be due and payable, $100,000 thereof upon the execution of this contract, and the remainder on or before the 30th day of June, 1893, in such sums and at such times as to the party of the second part may be most convenient; and the said bonds and stock shall be delivered by the parties of the first part to the party of the second part, in such amounts, and at such times, as they may be called for by the party of the second part, upon the payment of the balance of 95 per cent. due thereon, the said sum of $100,-000 being held and taken to be five per cent. upon the whole purchase of $2,000,000." By a further provision in the contract, the party of the second part secures an option upon all of the remainder of the bonds and stock which the governor and State treasurer are authorized to sell under said act, "said remainder of such bonds and stock being understood to be $3,800,000," until the first day of April, 1893, upon similar terms.

The first inquiry is as to the meaning of the terms "par or face value," as used in the sixth section above quoted. I cannot doubt that the word "par" and the words "face value," as

there used, are convertible terms, and mean one and the same thing. The manner in which they are connected, and the original and natural signification of those words, are quite sufficient to show this. What, then, is the legal interpretation to be put upon the word "par?" In 17 Am. & Eng. Enc. Law, 311, I find the following, stated upon the authority of Bouv. Law Dic.: "Par, equal. The word is used to denote a state of equality, or equal value. Bills of exchange, stocks, and the like, are at par when they sell for their nominal value; above par or below par when they sell for more or less." Under this definition, which has not only the support of high legal authority, but is in accordance with the natural meaning of the word, what is the par or face value of a bond which has been bearing interest at a given rate for some time prior to the sale thereof? Surely it is not merely the principal sum originally due, but it is that sum, with the accrued interest added, for that is what the bond calls for, that is the sum named in the bond, that is its nominal value.

This view is not without the support of authority elsewhere, though, so far as I am informed, we have no authority upon the point in this State. In the great States of New York and Pennsylvania these terms have been defined in accordance with the view which I have adopted. *Delafield* v. *State of Illinois,* 2 Hill (N. Y.), 159, was a case in which the court was called upon to construe the meaning of the words "par value," in a statute requiring State bonds to be sold at not less than their par value, and it was held that par value meant the amount due on the bonds at the time of the sale. At page 172, Bronson, J., in delivering the opinion of the court, after saying that the question was not as to the "par of exchange," used these words: "It is a question of *par value;* and if that does not mean in this case a dollar in money for every dollar of security, the wit of man cannot tell us what it does mean." Again, on same page, he says: "The par value of a bond is the sum due on it, and not the sum originally secured by it." That case seems to have been very much like the one under consideration, for the objection there, as here, was that the bonds were on interest long before the money was to be paid, and a state-

ment to this effect was followed by the remark last quoted. See, also, the same case, more fully reported in 26 Wend., 192, where Senator Verplanck, in delivering his opinion, used this language: "The par value would, in the common language of the stock market, as well as the natural interpretation of the phrase, independently of usage, be the amount due on the face of the certificate. But the actual sale is made on terms which, on the $300,000 sale, give the appellant an advantage of 103 days' interest, and on the $283,000 sale, of above ten months. I cannot, upon any understanding of the words, consider this a sale at par value, any more than if there had been an undisguised discount at the same rate." To the same effect, see *Hogg's Appeal*, 22 Penn. St. Rep., 479, where it is said by Lowrie, J., at page 488-9: "Par means the amount really due, including interest."

I find it altogether impossible to distinguish the case at present under consideration from the New York case above cited; for here, as there, the purchaser acquires the advantage of whatever interest may accrue upon the bonds purchased from the 1st day of January, 1893, up to the time of the delivery of the bonds, reduced, of course, by the cash payment made at the time of the execution of the contract; and this, it seems to me, is practically the same as if the bonds were purchased at "an undisguised discount at the same rate."

It is earnestly urged, however, that while this may be true, yet there are other provisions in the act which not only warrant, but require, a different construction to be put upon the words "par or face value," as used in the sixth section of the act. I fully assent to the proposition, that in construing an act of the legislature, its several parts must be considered together, so as, if practicable, to arrive at the true intent and meaning of the legislature. That is to say, if, in looking alone to one section of an act, a certain intent seems to be apparent, yet if, upon an examination of other sections of the same act, such an intent is shown to be inconsistent with the general scheme as developed by such other sections, then the construction of the section in question must, if practicable, be made to conform to such general intent. But I am unable to see that

the other provisions of the act, relied upon for the purpose,
reflect any light upon the construction which should be given
to section six of the act, forbidding any sale of the bonds at less
than their par or face value, or that the other provisions re-
quire or even warrant a construction different from that which
I have adopted.

The provisions relied upon for the purpose are found in sec-
tions eight, nine, thirteen, and fifteen. The provisions of
section eight are as follows: "That the State treasurer be, and
he is hereby, authorized and required to receive from the pur-
chasers of the new four and one-half (4½) per cent. bonds, who
may surrender, before the first day of July, 1893, all coupon
bonds and all certificates of stock, commonly known as 'brown
consols,' tendered by them, and shall thereupon, in exchange
for, and in lieu of, said bonds and certificates of stock so sur-
rendered, issue to said holders other coupon bonds and certifi-
cates of stock of equal face value with those so surrendered,
and of the kind, class, and description, the issue of which is
provided for in this act. Or the State treasurer may issue to
such holders as may require it, all bonds or all stock, or part
bonds and part stock, of said authorized issue in making such
exchange; and further, at the time of such surrender and ex-
change, the said State treasurer shall pay to the holder of such
bonds and certificates of stock (*i. e.*), the purchaser of the new
four and one-half per cent. (4½ %) bonds, in cash, the difference
in interest from the date of exchange, or from the last interest
period, to wit, January, 1893, up to and including the maturity
of such bonds and stock, that is to say, one and one-half per
cent. (1½ %) per annum interest."

Now as the manifest object of the act was to provide for the
retiring of the old brown consols, bearing interest at the rate
of six per cent. per annum, and maturing on the 1st day of
July, 1893, by issuing new bonds bearing a less rate of interest,
the legislature obviously contemplated and provided for two
modes of effecting that object: First, by selling the new bonds
and applying the proceeds of the sale to the payment of the
old bonds; secondly, by an exchange of the new bonds for the
old—either or both of which modes might be adopted. But as

the holders of the old bonds could not be expected to exchange such bonds for the new bonds "of equal face value," bearing a less rate of interest, it seems to me clear that the sole object of the provisions contained in the eighth section of the act was to provide for the difference in the rate of interest, and cannot be regarded as reflecting any light whatever upon the provisions of the sixth section, which contemplated a different mode of retiring the old bonds, to which the provisions of the eighth section can have no application—certainly cannot have the effect of qualifying the express mandate contained in section six, that the new bonds shall not be sold at less than par or face value. The utmost that can be said as to the effect of the provisions contained in section eight, is that the purchasers of the new bonds are thereby authorized to pay the purchase money of the new bonds in old bonds of equal face value, and at the same time receive in cash the difference in the interest. But this is a very different thing from authorizing the sale of the new bonds at less than par, which, as has been shown, would be the effect of the terms of the agreement to sell. In section six the minimum *amount* of the purchase money is fixed at par, and, at most, section eight only provides how the purchase money may be paid, without, in the least, affecting the amount thereof.

Section nine of the act, after providing for the keeping a correct registry of the bonds that may be sold, and that the proceeds of such sale shall be kept as a separate fund, to be used exclusively for the final redemption of such of the old bonds as shall not be exchanged for the new issue contemplated by the act, concludes in these words: "*Provided, however,* That the governor and State treasurer, if in their judgment it is best so to do, shall have authority to exchange, in whole or in part, the new 4½ per cent. bonds for brown consols, upon such terms as may best subserve the public welfare." From this it is argued that the intention of the legislature was to invest the governor and State treasurer with the widest discretion, limited only by what they might regard as best calculated to subserve the public welfare. While this may possibly be true, so far as the *exchange* of the bonds is concerned, even though

other portions of the act seem to limit their discretion in this respect, yet it certainly cannot be true that the legislature intended to invest these officers with any such discretion as to the amount for which they might *sell* the new bonds; for the legislature, in section six, not only authorizes but *instructs* the governor and State treasurer to sell the new bonds ''at not less than par or face value.'' The fact, if it be a fact, that the legislature intended to invest these officers with the largest discretion in effecting the desired object of retiring the old bonds in one of the modes contemplated, would not necessarily imply an intention to confer a like discretion in attaining the end desired by the other mode contemplated, even in the absence of an express declaration to the contrary. But where, as in this case, there is an express limitation of their discretion in making a sale of the bonds, I do not see how there can be a doubt upon the subject. I cannot think, therefore, that the provisions of the ninth section can have any effect in qualifying the express provisions of section six of the act.

Section thirteen of the act reads as follows: ''That the governor and State treasurer are hereby authorized, in their discretion, to perform all and singular every act necessary to carry out the provisions of this act not herein specifically given, and which are not inconsistent with the provisions hereof; and in order to have the said bonds and stock promptly placed, the governor and State treasurer are hereby authorized to offer and pay a commission to parties placing said bonds and stock; and the funds belonging to the sinking fund are hereby appropriated to pay such commission, if so much be necessary: *Provided, however,* That they shall have said bonds and stock placed without paying a commission, if practicable.'' It is very clear that the discretion with which the governor and State treasurer is invested by the first branch of this section, to do any act necessary to carry out the provisions of the act, cannot have the effect of investing those officers with authority to sell the bonds at less than par; for such discretion is expressly limited to such acts as ''*are not inconsistent with the provisions hereof,*'' and to sell the bonds at less than par, would be not only incon-

sistent with, but in direct violation of, the provisions of section six of the act.

It is argued, however, that the provisions contained in the latter part of the section, to pay a commission, without limit as to amount, "to parties placing said bonds and stock," authorizes the payment of the *bonus* which, under the terms of the contract in question, the purchasers are to receive, in the shape of the interest on the bonds purchased from the 1st of January, 1893, to the time of delivery, as practically commissions for placing said bonds and stock. Without stopping to inquire whether the amount of commissions authorized to be paid is not, in fact, limited by the amount of the fund appropriated for the purpose, or whether the amount of that fund is, or is not, sufficient to pay the *bonus* which the purchasers are to receive, which, under the view I take, is not material, I do not think that the provisions of this section authorize the payment of ͺ*any* commissions to the *purchaser* of the bonds, though they do authorize the payment of commissions to an agent who may be employed for the purpose of placing, as it is technically called, the bonds and stock issued under the authority of the act. The relations of an agent to the State by whom he is employed to sell or negotiate the sale of its bonds, or to exchange a new issue of bonds for old bonds, are so wholly different from those of a purchaser of such bonds, that the two positions should not be confounded. The interest, as well as the duty, of an agent employed to sell the bonds upon a commission of a given per cent. on the price of the bonds, would require him to sell upon the best terms possible, while the interest of a purchaser would prompt him to obtain the bonds at the lowest price possible. I cannot think, therefore, that the legislature ever intended that a commission should be paid to the *purchaser* of the bonds, who would very naturally endeavor to obtain them at the lowest possible price; but that the language used in the section plainly indicates an intention to authorize the payment of commissions to some agent employed to place the bonds (by which I understand, to sell or negotiate the sale of the new bonds, or the exchange of the new bonds for the old), who

would be prompted by both duty and interest to obtain the best terms for the State practicable.

This view is supported by high authority. *Appeal of Whelen*, 108 Penn. St. Rep., 162. It appears in that case, that the legislature of Pennsylvania had passed an act authorizing certain municipalities, amongst which was the city of Pittsburg, to issue municipal bonds, which should be sold at not less than par, and providing that the municipal authorities might allow a reasonable compensation for the sale or negotiation of said bonds. The authorities of Pittsburg entered into an agreement for the sale of its bonds at par, but with an allowance to the purchaser of one per cent., by way of commissions; and the court held that the true intent of the act was, that while compensation, in the form of commissions, could be paid to an agent employed by the city to effect a sale or exchange of the bonds, the act did not authorize the payment of any commissions to a purchaser who bought the bonds direct from the city authorities; and Mercur, C. J., in delivering the opinion of the court, said, in substance, that the contract to allow the purchasers a commission of one per cent. upon all bonds purchased or exchanged by them, was practically an agreement to sell the bonds at less than par, and was, therefore, without authority. One of the reasons given in the opinion why a *purchaser* cannot be regarded as an *agent* employed to make the sale is because his interests as purchaser would conflict with his duty as agent. As the Chief Justice in that case says: "The relation between agent and principal is so essentially different from that which exists between vendee and vendor, that it is useless to further elaborate the distinction." It seems to me clear that the advantage allowed to the purchasers in the way of accrued interest, by the terms of the contract in question, cannot be justified as an allowance, practically, of commissions.

It only remains to consider the provisions of the fifteenth section of the act, which is in these words: "That the holders of the South Carolina four per cent. bonds, issued for the redemption of the brown consols, shall have the right to surrender the said four per cent. bonds to the State treasurer, and

to receive in exchange therefor brown four and one-half per cent. bonds of equal face value, as provided for in this act." It seems, as I understand it, that a comparatively small amount of the State debt known as brown consols had been refunded in four per cent. bonds, issued under the act of 1889, as amended by the act of 1890, and the sole object of this section, as it appears to me, was to place the holders of these four per cent. bonds, as an act of simple justice to them, upon the same footing as the holders of the new four and one-half per cent. bonds, issued under the provisions of the act of 1892. At all events, I am unable to perceive what light the provisions of this section throw upon the question under consideration.

I am, therefore, unable to perceive how the provisions of section six of the act under consideration are either modified or qualified by any, or all, of the other sections of the act considered together, and, believing, as I do, that the contract in question provides for a sale of the bonds at less than par, I am forced to conclude that such contract is without authority.

For these reasons, I am compelled, with great deference, to dissent from the conclusion reached by the majority of the court.

Petition dismissed.