DAVIS v. CITY OF SAN ANTONIO et al.

(Court of Civil Appeals of Texas. San Antonio. Nov. 12, 1913. Rehearing Denied Dec. 10, 1913.)

1. MUNICIPAL CORPORATIONS (§ 921*)—BONDS —SALE—COMMISSIONS—"PAR VALUE."

Under Sp. Acts 1907, c. 70, amending the charter of San Antonio, and providing that all bonds shall net the city not less than their par value, with accrued interest to date of payment of the proceeds into the city treasury, no commissions, attorney's fees, or other expenses connected with the issuance and sale of bonds can be taken from the proceeds, unless the bonds are sold at a premium sufficient to pay such expenses; the term "par value" meaning a value equal to the face of the bonds, or at the rate of $1 in money for $1 in bonds.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1932–1935; Dec. Dig. § 921.*

For other definitions, see Words and Phrases, vol. 6, pp. 5163, 5164.]

2. MUNICIPAL CORPORATIONS (§ 921*)—BONDS —SALE—EXPENSES—PAYMENT.

By San Antonio City Charter, as amended by Sp. Acts 1907, c. 70, providing that bonds of the city shall not be sold for less than their par value, with accrued interest to date of payment of the proceeds into the city treasury, the city was not precluded from contracting to pay necessary expenses incident to the issuance of bonds, including commissions for the sale thereof and fees of expert attorneys for an opinion as to their validity, out of the general fund.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1932–1935; Dec. Dig. § 921.*]

3. MUNICIPAL CORPORATIONS (§ 214*) — EMPLOYÉS—AGENTS AND ATTORNEYS.

Under San Antonio City Charter (Sp. Acts 1907, c. 70) § 56, conferring on the city authority to create any office or agent deemed necessary to the city's good government and interest, the city was authorized to employ expert attorneys to pass on the validity of a bond issue, and to employ agents to sell the bonds on commission; the judgment of the council as to the necessity for such employment being final, unless fraudulent or unreasonable.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 582–588; Dec. Dig. § 214.*]

Appeal from District Court, Bexar County; W. F. Ezell, Judge.

Suit by Frank C. Davis against the City of San Antonio and others. Judgment for defendants, and complainant appeals. Affirmed.

George C. Altgelt, of San Antonio, for appellant. William Aubrey and George R. Gillette, both of San Antonio, for appellees.

FLY, C. J. Appellant instituted this suit against the city of San Antonio, its mayor, Clinton G. Brown, and J. Frank Gallagher, its treasurer, to restrain the payment by the city of San Antonio to a certain bank of a commission of 1.99 per cent. for the sale of certain improvement bonds issued by the city in the sum of $3,450,000, and the payment of a fee of $3,000 to a firm of attorneys of New York City. It was alleged in the petition that the city council of San Antonio is authorized by section 53 of its charter to borrow money on the credit of the city, and to issue bonds for permanent public improvements, after being authorized so to do by the vote of the taxpaying voters of the city; that under section 108 of the charter the council has power to create special funds for special purposes, but does not have power to transfer money from one fund to another, except an excess in the general fund over current expenses, which may be transferred to any other special fund, and that the city treasurer shall not pay any draft on the permanent improvement fund, except in payment for such improvements provided for by ordinance; that on July 18, 1913, in pursuance of an ordinance passed on June 16, 1913, an election was held in the city of San Antonio on the question of the issuance of bonds in the sum of $3,450,000 for certain public improvements, distinctly specified in said ordinance, the sums to be expended on each improvement named, and the taxpaying voters declared in favor of such issuance; that advertisements were inserted in different newspapers for the sale of said bonds, and on October 4, 1913, one Allen Frake, claiming to represent certain parties, made the following proposition to the city council: "We agree to find purchasers for your proposed $3,450,000 of bonds issued for various purposes, offered for sale on October 2, 1913, bearing interest at the rate of 5 per cent. per annum, payable semiannually in New York or San Antonio at the option of the holder, of date, maturities and denominations as advertised, at a price of not less than par, and accrued interest to date of delivery of the bonds to us at the Continental & Commercial Trust & Savings Bank in Chicago, said bonds to be delivered to us as follows: $500,000 as soon as legality is established; $500,000 three months from that date; $500,000 six months from that date; the remainder of the issue to be delivered within six months thereafter. We are to have the option of having all or any part of the bonds delivered at any time earlier upon giving to the city of San Antonio, Texas, notice in writing 30 days beforehand. This bid is subject to the legality of the issue, and the sale of the bonds under the terms hereof being approved by Dillon, Thomson, and Clay, of New York City. In consideration of our acting as your agents in this matter, and placing the bonds at a price of not less than par and accrued interest, a commission of one and 99/100 per cent. (1.99%) to be paid us simultaneously as we take up the bonds. We

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

tender herewith check for sixty-nine thousand dollars ($69,000) on the Lockwood National Bank of San Antonio, Texas, as evidence of our good faith, said check to be held by you uncashed pending the investigation of the legality of the bonds, and is to apply pro rata in payment as the various installments are delivered in the ratio of two per cent. (2%) of the bonds delivered under the terms hereof. If the bonds are not awarded us, or the legality of the issue is not approved by Dillon, Thomson, and Clay, or if the sale or delivery of these bonds are the subject of legal proceedings for an injunction, this check is to be immediately returned to the said Lockwood National Bank."

It was further alleged: "And that said proposition was afterwards, by an ordinance of said city council, passed and approved on Monday, October 13, 1913, ratified, approved, adopted, and accepted, and the same referred to as an original contract entered into on the 4th day of October, A. D. 1913, by and on behalf of the city of San Antonio, through the mayor and finance committee of the city council, with the Continental & Commercial Trust & Savings Bank, Kountz Bros., and C. W. McNear & Co., acting through their agent, Allen Frake, and that by said ordinance the said Continental & Commercial Trust & Savings Bank, Kountz Bros., and C. W. McNear & Co. were made, constituted, and appointed the agents of said city of San Antonio in the name, place, and stead of said city to find purchasers and negotiate a sale or sales of said bonds upon the terms and conditions stated in said contract, which is made a part of said ordinance, and the check for sixty-nine thousand dollars ($69,-000) deposited by said parties shall be placed in the custody of the city treasurer, and by him held or applied in accordance with the terms of said contract." "That on the same day and at the same meeting of said city council said council passed an ordinance authorizing and directing the mayor of said city to employ Dillon, Thomson, and Clay, attorneys, to furnish to the city of San Antonio an opinion with reference to said bonds proposed to be issued and sold, said opinion to include and cover the legality of the issue and the sale of the bonds under the terms of said contract dated October 4, 1913, and said council at the same time appropriated the sum of three thousand ($3,000) dollars, or so much thereof as may be necessary out of the revenue for the current year, to provide for the payment of such fee in accordance with said ordinance and the proposition of said Dillon, Thomson, and Clay contained in their letter of September 15, 1913."

It was alleged that the ordinances were void, because, under the terms of the charter, the bonds could not be sold for less than par and accrued interest, and the commissions and attorney's fees could not be paid out of the money received for the bonds, and the city attorney alone is authorized to represent the city in all legal matters, and the Attorney General of Texas is required to pass upon the legality of all bonds, that appellant is a taxpaying citizen of San Antonio and a resident thereof, and he prayed that appellees be restrained from paying any part of the ᵒommission of 1.99 per cent. to any person, and be restrained from paying the attorney's fee or any part thereof to any one, and that a temporary restraining order be issued.

Appellees filed a general demurrer, and answered all the allegations as to the power of the council to issue bonds when authorized by the taxpaying voters, as to creating special funds, and that no funds can be transferred from one special fund to another, except as indicated, as to drawing warrants, as to the election on the issuance of bonds, as to the issue being authorized, and as to the advertisement for bidders and the proposition by Frake. It was further alleged that the first ordinance, passed on October 13, 1913, provided that the bonds should be sold according to the terms of the charter; that the commission was not a discount on the bonds; that the parties contracting for the commissions are not the purchasers of the bonds; that the employment of the attorneys was a customary and proper measure; that the payment for their legal opinion was properly a part of the current expenses of operating the affairs of the city for the current year; and that there were necessarily many items of expense incident to the bond issue which were proper and legitimate current expenses of the city.

It was further alleged that, after the passage of the ordinance of October 13, 1913, that is, on October 20, 1913, the said ordinance was amended, altered, and modified by another ordinance, which is as follows:

"Be it ordained by the city council of the city of San Antonio:

"Section 1. That the original contract attached hereto made and entered into on the 4th day of October, 1913, by and on behalf of the city through the mayor and the finance committee of the city council, with the Continental & Commercial Trust and Savings Bank, Kountz Brothers, and C. W. McNear & Company, acting through their agent Allen Frake, with reference to the sale of $3,-450,000 bonds of the city of San Antonio, dated September 1st 1913, and in the above recitals more fully described, be and the same is hereby ratified and confirmed as the contract of the city of San Antonio and is made a part of this ordinance; provided however that the term 'legality' shall be deemed to include, inter alia, the approving opinion of the Attorney General, the registration by the comptroller and the submission of the bonds to the option of the state board of education, all said measures being requirements of statute; and provided further that said bonds when sold shall net to the city not less than their par value, with ac-

crued interest to the date of the payment of the proceeds into the city treasury; and subject to the provisions of this ordinance the said Continental and Commercial Trust and Savings Bank, Kountz Brothers and C. W. McNear & Company are hereby authorized and directed to proceed with the finding of purchasers for said bonds and to arrange a sale or sales therefor to the best advantage of the city in accordance with said contract and this ordinance, and subject to and conditioned upon the ratification and approval of the city council; and the check for said sixty-nine thousand ($69,000) deposited by said contracting parties shall be placed in the custody of the city treasurer and shall be by him held, applied or disposed of in accordance with said contract.

"Sec. 2. That all ordinances or parts of ordinances inconsistent herewith be and the same are, hereby repealed."

In a trial amendment by appellant it was alleged "that neither said attorney's fees nor said commission can be lawfully paid out of any funds belonging to the city of San Antonio, because said bonds would not then net the city par and accrued interest, and the pretended payment out of any other fund belonging to the city would be an evasion of the charter requiring the bonds to net par and accrued interest."

The trial court entered a decree overruling the general demurrer to the petition, and denied a temporary injunction.

In the decree it is recited that it was agreed by the parties "to submit the case on bill and answer without argument or further evidence," and it may be inferred from that recital that the agreement was that the pleadings should be considered as evidence.

The allegations of the petition amount to a claim that the appellees were endeavoring to sell to a Chicago bank the bonds of the city of San Antonio for the face value of the bonds, with accrued interest, less the sum of $68,655, called commissions, and $3,000, denominated attorney's fees; that the transaction was a scheme to evade the provisions of the charter, and to sell the bonds at a sum less than par and accrued interest. This was fully denied by the appellees, and it is provided in the ordinance of October 20, 1913: "That said bonds shall net to the city not less than their par value, with accrued interest to the date of the payment of the proceeds into the city treasury; and subject to the provisions of this ordinance the said Continental and Commercial Trust and Savings Bank, Kountz Brothers and C. W. McNear & Company are hereby authorized and directed to proceed with the finding of purchasers for said bonds and to arrange a sale or sales therefor to the best advantage of the city, in accordance with said contract and this ordinance, and subject to and conditioned upon the ratification and approval of the city council. * * * " All ordinances inconsistent with the last ordinance were repealed.

Article 617, Revised Statutes of 1911, which was enacted in 1893, provides: "Hereafter no bonds executed by any county, city, or town shall bear a higher rate of interest than six per cent. per annum, and shall not be sold at less than its par value and accumulated interest, exclusive of commissions." By reasonable implication the explicit exclusion of commissions might be deemed permission to take the other necessary expenses arising from the issuance of bonds out of the proceeds of the sale; but we incline to the opinion that the Legislature desired to intensify its opposition to the payment of commissions out of the funds voted for a specific purpose. The law, with many others of that period of our history, was an expression of the reaction of the people, under the guidance of the wisest and greatest of Texas Governors, against the exploitation of the money of the people then so prevalent by all classes of corporations, both public and private. It was especially an expression of the people against the use of public money in paying large commissions to political favorites without any competent service rendered therefor, thereby diverting large sums from the purpose for which it has been intended. However, in 1907 a special law was passed amending the charter of the city of San Antonio, in which it was enacted: "All bonds shall specify for what purpose they were issued and when sold, shall net the city not less than their par value, with accrued interest to the date of payment of the proceeds into the city treasury, and the bonds may be negotiated in lots as the city may direct." That provision of the charter is fully as stringent and comprehensive as the general law. The whole of the special law on the subject has not been quoted, however, for another alternative seems to be contemplated, and that is the implied power granted the city council to contract to pay the contractor undertaking such public improvements, who shall agree thereto in said bonds for the work to be performed. That provision, if executed, would place the money of the people at the mercy of contractors, who, to protect themselves, would enter bids that would form the basis for discounts amounting, not to 2, but perchance to 10 or even 20, per cent. Bids would be made for such sums for public improvements as that the bonds would not only not bring par and accrued interest, but would realize sums largely under par. The effect of the whole provision would be to prevent any expenses being taken out of the proceeds of the bonds which must realize par value and accrued interest, and thereby force the making of contracts in which the work performed would be paid for in bonds. This would undoubtedly be the result of the contention of appellee that expenses such as commissions or attorney's fees cannot be paid

out of any fund whatsoever. Under that construction of the charter provision bonds could not be sold at all, unless at a heavy premium, and to make improvements the bonds would necessarily be used as the basis of compensation therefor. No such alternative should be forced upon any city.

Much space is given in appellant's brief to the discussion of repeals by implication, and a number of decisions are cited to the effect that repeals by implication are not favored. We need not consider repeals by implication in this case, for, if the general statute is in conflict with the special law, it is directly and expressly repealed. Subdivision 3, § 124, p. 562, Acts of 1907. It follows that it does not matter whether there is no conflict between the two laws, as we are inclined to believe, or that they are in conflict; the special law of 1907 must govern, so that in either case the special law will be the charter of the power conferred upon the city council.

[1] In order that the bonds should "net the city not less than their par value, with accrued interest to the date of payment of the proceeds into the city treasury," it is clear that no expenses can be deducted from that sum, not only commissions and attorney's fees, but any other expense connected with the issuance and sale of the bonds. This construction has been placed by some courts upon statutes not so drastic or exacting as the one in consideration. State of Illinois v. Delafield, 8 Paige (N. Y.) 527; Evans v. Tillman, 38 S. C. 238, 17 S. E. 49; Commonwealth v. Williamstown, 156 Mass. 70, 30 N. E. 472; Village of Ft. Edward v. Fish, 156 N. Y. 363, 50 N. E. 973.

In the Delafield Case cited it was said: "The very idea of a sale of a bond, or draft, or other security for the payment of money at par is that it is to be sold dollar for dollar of the amount due and payable thereon. * * * Such is the popular or generally received meaning of the terms 'par' or 'par value,' and this was unquestionably the sense in which these terms were used by the Legislature of Illinois in the statute under which the officers of the state were authorized to issue these bonds."

Speaking on the same subject, the Court of Appeals of New York, in the cited case of Village of Ft. Edwards v. Fish, held: "The Legislature enacted that the bonds should not be 'disposed of by such commissioners at less than the par value thereof.' * * * The first question presented for decision is, What is the meaning of the words 'par value' as thus used in the statute? 'Par' means equal, and 'par value' means a value equal to the face of the bonds. A sale of bonds at par is a sale at the rate of a dollar in money for a dollar in bonds. This is the accepted meaning of the term in the mercantile world, which the Legislature is presumed to have adopted in enacting the statute."

The provision of the charter is broader and more rigid than the statute of New York, to which that construction was applied, for it provides that "the city shall net" par value and accrued interest. The word "net" must mean clear of all charges, expenses, discounts, commissions, or sums of any kind.

[2] In passing upon the powers of the commissioners of the village, the New York court held: "The actual power was to borrow money by issuing and selling bonds at not less than par. The express power to issue bonds involved the implied power to pay for engraving, printing, and the like. The express power to sell bonds doubtless carried with it the implied power to pay counsel for an opinion as to the validity of the bonds, as was done in this case, and possibly to pay a commission to brokers for selling the bonds. These expenses were incidental to the duty imposed, and fairly came within the scope of the main power." Approving that case, the same court, in Armstrong v. Village of Ft. Edward, 159 N. Y. 315, 53 N. E. 1116, held: "Where there is an express grant of power to them it carries with it, by necessary implication, every other power needful and proper to the execution of the power expressly granted. The authority to sell water bonds, therefore, carries with it the authority to secure such reasonable and proper assistance as may be requisite to bring about an advantageous sale of the bonds. * * * Those having charge of the selling of bonds have the right to exercise their discretion in selecting the agencies by which they shall make disposition of them; but in the selection of such agencies it is their duty to exercise their best judgment in the interests of the public whom they serve. The selection, therefore, must be made in good faith, and with a fixed purpose to further the interests of the constituency represented." That was said in a case in which suit had been filed to recover commissions for selling bonds, and, we think, correctly states the law applicable to such cases.

The opinion of the Supreme Court of Tennessee, in Miller v. Park City, 150 S. W. 90, goes further, and holds that the prohibition of the statute against sale of bonds at less than par was not violated by deducting an attorney's fee and other expenses incident to the sale, such as printing, lithographing the bonds, postage, etc. The court said: "They were sold at par and accrued interest. One thousand dollars was deducted by agreement for counsel fees, and the remainder for printing bills and the like. It has been held in numerous cases that the deduction of such expenses, when reasonable in amount and done in good faith, does not violate the prohibition contained in the enabling act against a sale at less than par. It would seem that there could be no fair dispute over a deduction for expenses incident to printing the bonds and placing them upon the market,

because the city could not reasonably expect a purchaser of its obligations until the obligation itself was cast into such form and published in such manner as the market would demand. It could not fairly be said to have bonds for sale until they were formulated so as to conform to the provisions of the enabling act and printed in accordance with the demands of the market. A like reason would include attorney's fees. It is well known that public securities are not readily marketable until their legality and validity have been approved by competent and reputable attorneys."

As in the Tennessee case, so in this, there was no evidence of fraud or bad faith on the part of appellees; but there was an evident attempt to comply fully with every requirement of the law. As was said in that case: "It is needless to say that, if charges of this kind are sought to be made the cover for an actual sale at less than par, or if they are grossly unreasonable and attended by marks of bad faith, the court would not hesitate to declare such transaction fraudulent and void."

The cases cited, we think, declare the proper doctrine as to the sale of bonds by a public corporation; but, under the peculiar reading of the charter, which requires that the sale of the bonds "shall net the city" the par value and accrued interest, we are not justified in going to the extent of holding that the expenses of putting the bonds upon the market can be deducted from the money received from the sale of the bonds. But, in order to execute the powers conferred upon the municipal government to sell bonds, some expense must be incurred, and to hold that no expense shall be incurred or paid out of the money realized from a sale of bonds or any other fund would be to prohibit the sale of bonds, unless they could be sold for a premium high enough to meet all expenses, which would amount to a prohibition of the sale, unless sold at a premium.

It cannot, with reason, be contended that the special statute was intended to prevent any expenditure of money in the submission of the question of a bond issue, for the publication of notices of the election and of tickets, for the preparation of voting booths and remuneration of election officers, for the expenses incident to declaring the result and the printing of the bonds, and obtaining the approval of the Attorney General of the state. These expenses must necessarily be paid out of some public fund, or the bonds cannot issue. They are absolutely necessary expenditures of money, and, if they must be paid out of some fund, any other expense must be paid out of some fund. The expenses of the issuance and sale of the bonds, it is clear, cannot be paid out of the money realized from their sale, unless a premium sufficient to meet the expenses is obtained, for that sale must net the city the principal and accrued interest to date of payment of the proceeds into the city treasury.

No issue of bonds for public improvements can be made by the city of San Antonio, without first submitting to the qualified tax paying voters of the city the proposition to borrow money, which shall distinctly specify the purposes for which the loan is desired and the improvements to be made, and, unless a majority of the votes cast is in favor of the proposition, no bonds can be issued. The use to which the money is to be devoted is designated and named by the voters, and the city council cannot divert it from the designated purpose, and to safeguard and protect the fund set apart by the voters to a certain purpose, and prevent its diversion and spoliation, the Legislature make it unlawful to sell the bonds for less than par and accrued interest. This provision is imperative, and any sale for less than the sums mentioned would be null and void, "not simply as ultra vires, but as a forbidden act." Village of Ft. Edward v. Fish, herein cited. But the expenses incident to and arising out of the submission of the proposition to issue bonds, the election, the printing of the bonds, and their sale must necessarily be paid, and, as they cannot come out of the special funds, they must be taken, if at all, out of the general fund kept for current expenses. If the expenses cannot be obtained from the general fund, public improvements must cease, progress be thwarted, and advanced civilized methods be abandoned. That the Legislature intended any such result will not be entertained. The Legislature, while protecting the money voted by the people and dedicated by them to certain specific purposes, could not have desired to impede the march of progress, and prevent the improvements demanded by the civilization of the age in which we live. While restricting the use of the dedicated money, it was not designed to manacle municipal authorities, and cause all improvement and material progress to cease. The reasonable expenses absolutely necessary for the issuance and sale of bonds for public improvements must be paid, and, if the special fund arising therefrom cannot be touched, the money must come from some fund not set apart for a special purpose. The Legislature has not attempted to interfere with the power of the city council to use the general fund for what may be deemed by it to be legitimate, necessary, current expenses.

[3] As to what are necessary expenses in issuing and floating the bonds need not concern this court, because that question is not raised in the case, the sole contention being that certain items of expense cannot be paid out of any fund belonging to the city; in other words, that the city government can under no circumstances pay a commission for the sale of bonds, nor attorney's fees. In section 56 of the charter the city council is given the authority "to create any office

or agent deemed necessary for the good government and interest of the city," and under numerous decisions the language is broad enough to authorize the employment of an agent to sell bonds or to pass upon their legality. Abbott, Mun. Corp. § 708; Franklin County v. Layman, 145 Ill. 138, 33 N. E. 1094; Connolly v. Beverly, 151 Mass. 437, 24 N. E. 404; Garrigus v. Howard County, 157 Ind. 103, 60 N. E. 948; Harris v. Gibbins, 114 Cal. 418, 46 Pac. 292; Church v. Hadley, 240 Mo. 680, 145 S. W. 8, 39 L. R. A. (N. S.) 248; Manitou v. First Nat. Bank, 37 Colo. 344, 86 Pac. 75; State v. Land Co., 75 Minn. 456, 78 N. W. 115; Hunt v. Fawcett, 8 Wash. 396, 36 Pac. 318. The charter giving the authority to employ agents, the necessity for such employment is a matter for the judgment of the city council, and such judgment cannot be questioned, unless shown to be fraudulent and unreasonable. Simrall v. City of Covington (Ky.) 29 S. W. 880. The authority to employ carries with it the authority to pay the agent.

In the case of Allen v. Abernethy, 151 S. W. 348, this court sustained the judgment of the district court which was based on a new order of the commissioners' court of Atascosa county setting aside objectionable portions of a former order, and denied a writ of injunction, on the ground that the new order had given the applicant all he demanded. So in this case the ordinance passed by appellees on October 20, 1913, met all objections urged as to the bonds not being sold for their net par value with accrued interest. If, as contended by appellant, the first ordinance was void, nothing was accomplished by it, and, if the parties desiring to buy the bonds were not parties to the last ordinance, and are not bound by it, that fact could not possibly injure appellant, and can be a matter of no concern whatever to him. If the contracting parties do not accede to the last ordinance, the whole negotiation falls to the ground, and there would be nothing to restrain, and the writ of injunction was properly refused.

The necessity for the employment of agents to assist the city in the negotiations necessary in the sale of bonds must be addressed to the judgment and sound discretion of the city council, and some latitude must be extended to that discretion in the sale of bonds of such denominations as have been provided for by the people of San Antonio. The number of purchasers of bonds for so large an amount as nearly $3,500,000 are necessarily few, and the greatest caution will be exercised by them in detecting irregularities in the issue of the bonds, or matters that may affect their validity, and they have the right to demand the opinions of attorneys of undoubted reputation who have devoted themselves to the consideration of such questions. It has been held that, even where there had been no stipulation in the contract for the

opinion of reputable attorneys as to legality of bonds, "it is necessary, in order to give effect to the intentions of the parties, to read into the contract an implied condition that the buyers should not be bound to take the bonds, unless the proceedings of the city government had been conducted in substantial conformity with the laws, and proper records had been made, so that competent lawyers of good reputation would be able to certify to the validity of the bonds." City of Great Falls v. Theis (C. C.) 79 Fed. 943.

Recurring to the position taken by this court that, under the provisions of the charter, the expenses attending the issuance and sale of bonds cannot be paid out of the proceeds arising from the sale of the bonds, but that they can and must be paid out of the general fund, we find the position sustained by the Supreme Court in the case of Dallas County v. Land & Cattle Co., 95 Tex. 200, 66 S. W. 294, which is cited by appellant. In that case it was held that the gross proceeds of the sale of school lands by counties must be used for school purposes, and that no expenses of the sale can be deducted therefrom, but that all such expenses must be paid out of the general fund. The court, in construing the effect of the grant of lands to counties for school purposes, held: "This legislation tends to show that the policy was to preserve the entire lands and their entire proceeds intact as a permanent school fund for the use of the public schools of the county. The words 'said lands' as used in section 6 evidently mean all the lands. The provision embraces as well all lands that might thereafter be granted as well as those which had been previously acquired, and it would seem to have been contemplated that in case of future grants all the lands which were granted to a county should become its permanent special school fund, and that no part should be given for the expenses of locating and surveying them. In other words, it was intended that such expenses should be paid by the county from its general fund. If such was the intent as to the lands themselves, it is to be inferred that there was a like intention as to the proceeds—that the entire proceeds should be held, and that the county should pay the expenses of a sale, if any, out of its own proper funds." So in this case the money arising from the sale of bonds for permanent public improvements at par with accrued interest is devoted by the statute to a special purpose, and no part of it can be diverted from that purpose; but the necessary expenses attendant upon the issuance and sale of the bonds must come from a fund not dedicated and set apart to a special purpose.

It may be contended that the burden at last falls upon the taxpayer, no matter from which fund the expenses may be paid; but, the expenses being absolutely necessary, the taxpayer should not be heard to complain at

their payment, nor should he complain that the expenses are taken from a fund other than that raised for public improvement, and that every dollar of that fund is devoted to the purpose for which it was voted.

There was no attempt to use the special fund voted by the people of San Antonio for the improvement of its streets for any other purpose, and it is not so charged in the bill, nor contended for in this court, and it is the opinion of this court that the city council, having been clothed with authority to sell bonds, had the implied authority to incur any legitimate, reasonable expense necessary to execute its powers, and that it is empowered to pay such expenses out of the general fund of the city.

The judgment of the district court is affirmed.