## WILLIAMS *v.* LOUISIANA.

In a suit brought, in one of her courts, by the State of Louisiana, seeking to restrain payment on the bonds issued to the New Orleans, Mobile, and Chattanooga Railroad Company, under an act of the legislature approved April 20, 1871, and praying for relief, upon the ground that the act was in violation of the constitutional amendment of 1870, which declares " that, prior to the first day of January, 1890, the debt of the State shall not be so increased as to exceed twenty-five millions of dollars," which limit, it was claimed, had been attained before the passage of the act, a holder of some of the bonds, who was permitted to intervene, set up that they were issued in discharge and release of valid and then subsisting obligations of the State, which, prior to the adoption of the amendment, had been created under her legislation. *Held*, that this court has jurisdiction to determine whether the amendment, as construed by the court below and applied to the facts of the case, impairs the obligation of a contract. *Held*, further, that the act is in conflict with that amendment, inasmuch as it authorized the creation of a new debt on a new consideration, in excess of the prescribed amount, and that the bonds are void.

ERROR to the Supreme Court of the State of Louisiana. The facts are stated in the opinion of the court.

*Mr. Simon Sterne* and *Mr. George W. Biddle*, with whom were *Mr. A. Sydney Biddle* and *Mr. James Lowndes*, for the plaintiff in error.

*Mr. Gustave A. Breaux* and *Mr. James Lingan* for the defendant in error.

MR. JUSTICE MILLER delivered the opinion of the court.

A suit was brought by the Attorney-General of Louisiana in the name of the State, in the Superior Court of the District for the Parish of New Orleans against Charles Clinton, State auditor, and Antoine Dubuclet, State treasurer. The petition enumerated a great number of claims against the State which it declared to be illegal and void, and which it was feared the auditor would allow, and the treasurer pay, against which action the petition prayed for an injunction. Among these claims, the only one which demands our attention was one for $2,500,000 of State bonds issued under the act of the legislature of April 20, 1871, entitled "An Act to relieve the State from its obligation to guarantee the second-mortgage bonds of the New Orleans, Mobile, and Chattanooga Railroad Company." While there were several grounds of objection stated in the petition, the only one which concerns us is the allegation that the issue of these bonds was an attempt to create a debt of $2,500,000, when the limit to the State debt of $25,000,000, as fixed by the amendment to the State Constitution of 1870, had already been exceeded. In this suit the New Orleans, Mobile, and Texas Railroad Company, successors to the New Orleans, Mobile, and Chattanooga Railroad Company intervened, and the temporary injunction was dissolved.

On appeal to the Supreme Court the order dissolving the injunction was reversed, and when the case came back to the court of original jurisdiction for further proceedings, Williams and Guion were permitted to intervene for their interest as holders of three of the bonds of $1,000 each, the payment of which was sought to be enjoined in the suit.

The Superior Court decreed the bonds to be void, and perpetually enjoined the treasurer from paying them on their interest coupons, and on appeal to the Supreme Court that decree was affirmed. It is this final judgment of the Supreme Court

of the State that the present writ of error sued out by Williams and Guion seeks to review.

The reason why the State court held these bonds void is that by an amendment of the Constitution of the State, adopted in 1870, no debt should be thereafter created which, added to the debt of the State then existing, would swell the total amount above $25,000,000; and that amount had been reached before the issue of the bonds in question and before the act of the legislature under which they were issued had been passed.

Counsel for defendants in error insist that the writ of error should be dismissed for want of jurisdiction.

They say that the suit is one in the courts of their own State, to which the State itself is a party plaintiff, against its own officers, and the decision rested entirely on the construction of the Constitution and laws of the State, and that no question of Federal law is involved in it. If this be strictly true, their contention should be sustained.

In answer to this, it is said that the bonds held by the intervenors were founded on an obligation which existed prior to the constitutional amendment, and did not, therefore, add to the debt which existed when that amendment was adopted. This is denied by the counsel for the State, and upon the solution of this question the whole case depends, both as to its merits and as to the jurisdiction of this court. 'For it is insisted by plaintiffs in error that if their contract existed in effect before the amendment, the amendment as construed by the State court impairs the obligation of that contract, and this court can review that question; while if the bonds constitute a new and independent contract, the constitutional provision was properly applied to them and the judgment is right. As this is the question we are to decide, and as it was raised and insisted on by the plaintiffs in error in the court below, we think this court has jurisdiction.

The bonds in question were, as we have already said, issued under an act of the Louisiana legislature, approved April 20, 1871, which was after the constitutional amendment had become operative. That amendment, which went into effect in December, 1870, declares " that prior to the first day of Janu

ary, 1890, the State debt shall not be so increased as to exceed twenty-five millions of dollars."

That the State debt already exceeded that sum when the bonds were issued, and, indeed, when the act was passed under which they were so issued, is not denied. But, as already stated, the effect attributed to these facts is denied, on the ground that they were issued in lieu of and in extinguishment of an obligation of the State existing when the constitutional amendment was adopted.

To determine the soundness of this proposition, it is necessary to examine the statute which authorized their issue, and the nature of the supposed obligation on which the later transaction is said to be founded. The statute reads as follows, and is here given in full : —

"An Act to relieve the State from its obligation to guarantee the second-mortgage bonds of the New Orleans, Mobile, and Chattanooga Railroad Company, under an act of the General Assembly approved February 21, 1870, by subscription on the part of the State to the capital stock of said corporation, and to regulate the conditions of such subscription, and to secure the construction of the road of said corporation from Vermilionville to Shreveport.

"SECT. 1. (*a.*) Be it enacted by the Senate and House of Representatives in General Assembly convened, that the governor of this State be and is hereby authorized to subscribe for twenty-five thousand shares of $100 each of the capital stock of said corporation on behalf of this State, and to receive the certificates of stock therefor as payment shall be made for the same, which certificates shall be deposited by him in the office of the treasurer of this State, and shall not be assignable or transferable except by authority of the General Assembly.

"(*b.*) And be it further enacted, &c., that whereas the subscription for stock and the issue of bonds therefor herein provided are intended to extinguish the obligation of the State to indorse or guarantee the second-mortgage bonds of said corporation, under the act of the General Assembly relative to said corporation, approved February 21, 1870, and as a discharge of either party from all obligations for the issue, indorsement, guarantee, and security of said mortgage bonds, as provided in the fourth section of said act ; the said corporation shall be required, at or before the com-

plete issue of said bonds, to file with the secretary of stai.
release and acquittance of the obligations of the State so created to
guarantee said mortgage bonds, and for which the provisions of this
act are designed as a substitute and discharge; and the said cor-
poration shall, by its express agreement made and entered into by
the vote of its board of directors, and attested by its seal and the
signature of its secretary, obligate itself to commence that part of
its railroad from Vermilionville to Shreveport within six months,
and to complete the same within the time limited therefor in said
act of the General Assembly: *Provided,* that the said corporation
may purchase from this State the said shares of stock at their par
value, at any time prior to the maturity of the bonds issued there-
for, and may pay for the same in lawful money or in any of the
bonds of this State at their par value.

"SECT. 2. Be it further enacted, &c., that for the payment of
said subscription bonds of this State shall be issued, signed by the
governor and secretary of state, and sealed with the seal of the
State, payable not less than thirty-five, nor more than forty years
from their date, with interest at the rate of eight per cent per
annum, payable semi-annually in the city of New York, on the first
days of January and July of each year, for which interest coupons
bearing a fac-simile of the signature of the treasurer of the State
shall be attached to the bonds, and annually from and after the
issuing of the said bonds or any part thereof, there shall be imposed
for each fiscal year a State tax of one mill on each dollar of the
valuation, for each year, of the real and personal property in the
State, subject to taxation, which tax shall be assessed, levied, and
collected in current moneys by the annual assessment and collection
of taxes for each year, in the manner prescribed by law for the col-
lection of other taxes, and the moneys derived therefrom shall im-
mediately on collection be paid into the treasury of this State as a
distinct fund, and kept as a separate account; and such moneys and
all moneys received from said company for dividends on said stock
shall be applied in each and every year, first to the payment of the
interest as it shall accrue on the said bonds, and the balance, in each
year, shall be applied to the purchase of said bonds; such tax shall
continue to be so assessed, levied, and collected in each and every
year until all the interest and principal of said bonds, which shall
from time to time remain outstanding, shall be fully paid; and all
bonds and coupons so purchased and paid, shall be immediately
cancelled by the said treasurer.

"SECT. 3. Be it further enacted, &c., that from and after the sub-

scription aforesaid and the issue of the certificates of stock, and during the time the State shall own the same, the State shall be represented at the corporate meetings of the stockholders; and in the board of directors to be chosen by the other stockholders under the charter of their incorporation by the governor of the State for the time being, or by his proxy or by another director to be designated by the governor, whose duty it shall be to attend all the meetings, and perform all the duties incident to the office of directors, but that the directors thus appointed shall not vote in the elections of the board of directors provided for in the act of incorporation."

The act of February, 1870, here referred to is an act of many sections and subsections for the benefit of the New Orleans, Mobile, and Chattanooga Railroad Company, giving it increased privileges in the city of New Orleans, authorizing extensions of its projected road, and the unlimited issue of its own bonds.

The fourth section, in addition to this grant of the unlimited right to issue its own bonds authorizes the company to construct and maintain a road from any point on the main line of its road in the parish of St. Martin or Lafayette northwardly to Shreveport *via* Alexandria; and also from Iberville on the main line to the Mississippi at any point in the parish of West Baton Rouge, and declares that all the powers, privileges, grants, guaranties, and franchises, theretofore granted to said company for the construction, maintenance, and use of its main line of railroad within the State of Louisiana westerly from the city of New Orleans, shall be and are thereby made applicable to the said lines of railroad to Shreveport and to said point in the parish of West Baton Rouge : provided, however, that such provisions of the act, entitled " An Act to expedite the construction of the railroad of the New Orleans, Mobile, and Chattanooga Railroad Company, in the State of Louisiana," approved Feb. 17, 1869, as relates to the guaranty of the second-mortgage bonds of said company, shall be applicable only to such parts or portions of the said lines of railroads to Shreveport, and to said point in the parish of West Baton Rouge, as shall be surveyed, located, and constructed within five years from and after the acceptance of this act by said company; and the said provisions of said act shall be applicable to such parts or portions of said

last-mentioned lines of railroad as shall be surveyed, located, and constructed within the time last aforesaid.

The act of 1869 authorized the company to issue its bonds payable to the State of Louisiana, at the rate of $12,500 for every mile of railroad actually constructed and accepted by commissioners to be appointed by the governor. The payment of these bonds was to be secured by a mortgage on the road subject to a prior mortgage of the same amount, and the bonds are therefore designated in the statute as second-mortgage bonds. It was declared, also, that the failure to pay the coupons for interest on these bonds, or if any of the sinking refund required by the act should be in arrears for sixty days, the whole of the principal of the bonds should become due and the mortgage should contain a provision for the sale of the road by the trustee in that case.

These conditions being complied with, and the construction of forty miles of the road being completed to the satisfaction of the governor, he was directed to indorse on the bonds of the company, to the amount of $12,500 per mile for such forty miles, the guaranty of the State of Louisiana of the payment of these bonds, and deliver them to the company. This act also required the company to survey and locate the whole of the main line within eight months after acceptance of the act, a section of forty miles to be completed within twelve months after such survey, and the whole of the line within the State to be completed within three years after such survey and location; and a failure to comply with these requirements as to any part of said road released the State from the obligation to guarantee as to that part of the line. It is argued that the proviso to sect. 4 of the act of 1870, making the provisions of the act of 1869 applicable to the new lines, if constructed within five years instead of three, as in that act, does away with the provisions for requiring specific acts as to location and construction of forty miles, to be performed within shorter periods, and that the obligation of the State to guarantee the bonds continued for five years, though nothing had been done in the mean time.

We do not think this is a sound construction of the proviso, but that the period of five years is there mentioned instead of

three in the former act for the final completion of the road, a failure to comply with which released the State from its promise of any further guaranty of the bonds.

This, however, is not very material, as it only adds to the force of the argument, that when the State bought $2,500,000 of the stock of the company, and gave its own bonds for that sum, it was incurring a new debt, and was not discharging an old one of equal amount.

What was the obligation of the State in this matter prior to the act of 1871, and at the time the constitutional limitation of its debt became effectual? and what obligations are assumed by the issue of these bonds?

The State, by the former law, was to become surety for the bonds of the company without any other consideration than a desire for the construction of the road.

By the new amendment she became absolute debtor, and gave her own bonds.

By the former law she had a very stringent provision to secure her from loss for the use of her name as indorser of the bonds of the company.

By the new amendment she agrees unconditionally to pay $2,500,000 of money, with no security for its repayment and no indemnity against loss.

Under the former act she might never have been called on to indorse the bonds, as the conditions might never have been complied with, and if so called on, would perhaps have been held secure against loss by the provision for mortgage and sinking fund on a road to be constructed before the guaranty was indorsed on the bonds. And in fact it now appears very improbable that she would ever have been called on to indorse any bonds not already indorsed when the present bonds were issued.

Instead of a mere promise to indorse them, with a fair security against loss, with a reasonable ground of belief that the right to call for this guaranty would never arise, the State, by the new statute, subscribes for and purchases $2,500,000 of the stock of the company, gives her bonds for it, and becomes the debtor of the company for that amount.

By the new arrangement the State became transformed from

a possible creditor of the company, with security for her debt, into a debtor of the company with nothing to show for it but some worthless stock.

It seems impossible to hold that this is in any just sense a redemption of a former obligation. It is equally impossible to hold that the issue of these bonds, if valid, did not for the first time create a debt in regard to this transaction. There was no debt before this. There was no fixed obligation; no certain liability; no strong reason to believe that her promise would ripen into any absolute debt on her part.

The new arrangement was the creation of an unconditional debt of $2,500,000.

We are unable to discern the force of the reasoning by which validity is supposed to be imparted to these bonds by the act of the legislature.

The constitutional provision against an increase of the State debt was mainly if not solely intended to operate as a limitation on the power of the legislature. We do not know of any increase of the debt which could be lawfully made without its authority, unless it was by the non-payment of interest on what already existed. Certainly no new debt beyond the $25,000,000 could be made and be valid without such authority. It is, therefore, vain to say the legislature did it. It is equally vain to say that the legislature professed to be satisfying an old obligation, while on the face of the transaction it is quite apparent that it was a new debt, based on a new consideration, with only an incidental reference to an old contract liability to make it colorable.

We concur, therefore, with the Supreme Court of the State, in holding that these bonds constituted a new debt issued on a new consideration under a new act of the legislature, which was itself void because in conflict with the provision of the Constitution of the State, and the bonds are equally void as being in excess of the amount of debt which the State could constitutionally create.

*Judgment affirmed.*