(May 21, 1921.)

STATE OF IDAHO, on the Relation of D. W. DAVIS, Individually and as Governor of the State of Idaho; ROY L. BLACK, Individually and as Attorney General of the State of Idaho; and W. J. HALL, Individually and as Commissioner of Public Works of the State of Idaho, Plaintiffs, v. D. F. BANKS, Treasurer of the State of Idaho, Defendant.

[198 Pac. 472.]

STATE LEGISLATURE—CONSTITUTIONAL LAW—INDEBTEDNESS—APPROPRIATION—FISCAL AGENT.

1. The power of the state legislature in the creation of indebtedness, or the expenditure of state funds, or making appropriations is plenary, except as limited by the state constitution.

2. S. B. No. 319, 1921 Session Laws, page 112, authorizing and directing the state treasurer to appoint a fiscal agent, is not in conflict with the state constitution.

3. Chapter 193 of the Session Laws of 1919, proposed Idaho state highway bonds, fourth issue, to vote of the people, meets the requirements of art. 8, sec. 1, of the state constitution, and is a valid act of the state legislature.

Original application for writ of mandate. *Denied.*

Roy L. Black, Attorney General, Dean Driscoll, First Assistant, and James L. Boone, Assistant, for Plaintiff.

The legislative body is not without power to raise the interest rate on a bond issue submitted to the people, for the reason that the rate of interest was not one of the things

required to be submitted. (*Yesler v. City of Seattle*, 1 Wash. 308, 25 Pac. 1014; *Parkinson v. Seattle School Dist. No. 1*, 28 Wash. 335, 68 Pac. 875.)

The legislature, under ordinary circumstances, laying aside the particular facts of this case, has full and ample authority to make an appropriation of the kind in question. (36 Cyc. 882.)

A commission may be paid a broker for the services in selling state bonds, even though under the state constitution the vote of the people was necessary to authorize the bonds and the act submitted to the people specified the rate of interest and that they should not be sold below par. (*Church v. Hadley*, 240 Mo. 680, 145 S. W. 8, 39 L. R. A., N. S., 248; *Town of Manitou v. First Nat. Bank*, 37 Colo. 344, 86 Pac. 75; *Miller v. Park City*, 126 Tenn. 427, Ann. Cas. 1913E, 83, 150 S. W. 90; *Davis v. City of San Antonio* (Tex. Civ. App.), 160 S. W. 1161; *State v. West Duluth Land Co.*, 75 Minn. 456, 78 N. W. 115; *Village of Ft. Edward v. Fish*, 156 N. Y. 363, 50 N. E. 973; *Armstrong v. Ft. Edwards*, 159 N. Y. 315, 53 N. E. 1116; note, Ann. Cas. 1913E, 85; note, 39 L. R. A., N. S., 248; 2 Dillon on Municipal Corp., 1399.)

D. A. Dunning, for Defendant.

Interest, when provided for on the face of the instrument, is a part of the debt. (*Broadfoot v. City of Fayetteville*, 128 N. C. 529, 39 S. E. 20; *Davis v. Harrington*, 160 Mass. 278, 35 N. E. 771.)

If the debt cannot be created except with the approval of the people, and the interest is a part of the debt, then the legislature cannot create a different debt by a change in the rate of interest.

The terms and conditions of the bonds must substantially follow the act submitted. (*Skinner v. City of Santa Rosa*, 107 Cal. 464, 40 Pac. 742, 29 L. R. A. 512.)

The fact that securities have, in violation of law, been sold at less than their par value cannot be concealed or its

effect destroyed by so flimsy a theory as a commission paid
to the purchasers of the bonds. (*Whelen's Appeal,* 108 Pa.
St. 162, 1 Atl. 88.)

The payment of a commission to a bank, which purchased
an entire issue of bonds, subsequently disposing of the bonds
to its customers, was held to be in substance and effect
a discount in violation of the law requiring sale at par.
(*Bay City v. Lumbermen's State Bank,* 193 Mich. 533, 160
N. W. 425; *Hunt v. Fawcett,* 8 Wash. 396, 36 Pac. 318;
*Franklin Ave. German Sav. Inst. v. Board of Education,*
75 Mo. 408.)

It is believed that the framers of the constitution desired
to distinguish between a purpose and a work, and that those
words were used in our constitution so that the legislature
would not be foreclosed or rendered powerless to create a
debt for an object as distinguished from a work which the
people of Idaho would approve in a referendum. *Paxton
v. Baum,* 59 Miss. 531, construes the word "object" to mean,
"the end aimed at; the thing sought to be accomplished."
In *State v. De Hart,* 109 La. 570, 33 So. 605, "object" is
construed to mean, "the aim or purpose." In *Scarborough
v. Smith,* 18 Kan. 399, it is held that "object" means, "the
thing sought to be attained." "The object of the statute
is the aim or purpose of the enactment." (*Allopathic State
Board of Medical Examiners v. Fowler,* 50 La. Ann. 1358,
24 So. 809.)

DUNN, J.—This is an original application by the Gov-
ernor, Attorney General and Commissioner of Public Works
of the state, individually as taxpayers and in their several
official capacities, for a writ of mandate directed to the
defendant, D. F. Banks, as State Treasurer, to compel him
to employ a fiscal agent or broker to procure or assist in
procuring a bidder for the Idaho state highway bonds,
fourth issue, and to take such steps as may be necessary
for the sale of said bonds.

The petition sets forth that pursuant to the provisions of chapter 193 of the laws of the state of Idaho for the year 1919, which directed the defendant as State Treasurer to issue and sell a series of state bonds of the par value of $2,000,000, to be known as Idaho state highway bonds, fourth issue, upon approval by the people at the next general election and pursuant to the constitution and laws of the state of Idaho, the question whether or not such bond issue should be authorized for the laying out, surveying and constructing of state highways was submitted to the electors of the state of Idaho on the second day of November, 1920, and that a majority of all the votes cast on said proposition at such election were in favor of the issuance of such bonds, and that the result of said election has been determined and certified as required by law. That thereafter the said State Treasurer gave due notice of the intention of the state to sell said bonds and invited bids therefor to be submitted on or before the thirty-first day of January, 1921, and that five bids were received, the highest of which was $87,420 below the par value of said bonds; that by the provisions of said chapter it is required that said bonds shall be sold at not less than par and upon the best terms offered and at the lowest rate of interest named by any bidder, not exceeding the rate of five per cent per annum; that all of said bids were rejected for the reason that they were below par of said bonds; that it is now, and at all times since the said chapter 193 became effective has been, and will be for an indefinite period in the future, impossible to sell said bonds at par to bear said rate of interest without the employment of a fiscal agent as hereinafter set forth, by reason of the fact that the rate of interest of money on loans is now, and for some time past has been, and for an indefinite time in the future will be in excess of five per cent per annum and the market for bonds of the character and of the interest rate provided in said chapter 193 below par.

That by an act of the sixteenth session of the legislature of the state of Idaho, known as Senate Bill No. 319, 1921

Sess. Laws, p. 112, approved March 8, 1921, which said act became effective immediately upon its passage and approval, the said State Treasurer was and is directed to employ a fiscal agent or broker to assist in procuring a bidder at not less than par and accrued interest for said bonds, for whose compensation and expenses the said treasurer is authorized and directed to expend the sum of not to exceed $97,500, for the entire bond issue, and proportionately for any part thereof, to be paid on payment for the bonds by the purchaser furnished, for which purposes the sum of $97,500 is appropriated by said act.

That relators have demanded of said defendant that he proceed to employ such fiscal agent or broker and again call for bids for said bonds and proceed to sell and issue the same pursuant to the provisions of said chapter 193, but that said defendant has failed and refused to employ such broker or fiscal agent or to take any other steps or proceedings whatever for the sale or issuance of said bonds, and still continues to so fail and refuse, and alleges as his reason and ground therefor that the said bonds cannot be sold for par bearing interest at the rate of five per cent per annum without employment of a fiscal agent or broker as provided by the said act of the sixteenth session of the legislature, and that said act is invalid and unconstitutional.

The petition further alleges the lack of funds in the hands of the state to proceed with the construction of the system of highways heretofore laid out and partially constructed, or to enable it to provide funds to carry on the large amount of work that is necessary to be done by it in co-operation with the federal government and with the several counties and highway districts of the state in order to obtain the financial assistance in the construction of the state highways that will be available if the said bonds can be sold and the money derived therefrom used in the construction of the highways throughout the state, and that without the funds to be derived from such sale much of the unfinished work done on this system of highways whose con-

struction has been undertaken by the state of Idaho will be lost.

The petition further alleges that in addition to the matters hereinbefore stated some question has been raised as to the validity of the said act known as Senate Bill No. 319, and that said bonds cannot be sold, or readily sold, or, if sold, cannot be sold at so high a price until after their validity and the validity of said Senate Bill No. 319 .have been determined by judgment and decree of this court; and that the plaintiff and relators have no plain, speedy or adequate remedy in the ordinary course of law.

The defendant filed a general demurrer to the petition. He also filed an answer in which he urges that said chapter 193 is unconstitutional and void, for the reason that "the purposes specified in said chapter 193 as the purpose of the issuance of said bonds and the creation of the indebtedness therein referred to are not distinctly specified in said chapter 193, in that neither the extent, mileage, location, general character nor termini of the highways to be completed or constructed are set forth, nor do the same constitute some single object or work." We will first dispose of the question raised by the answer as to the constitutionality of chapter 193.

The constitutional provision referred to above, article 8, sec. 1, prohibits the creation of the indebtedness provided for in chapter 193, Session Laws 1919, "unless the same shall be authorized by law, for some single object or work, to be distinctly specified therein." The word "object" is defined as "the end aimed at; the thing sought to be accomplished" (*Paxton v. Baum,* 59 Miss. 531, 536); "the aim or purpose" (*State v. De Hart,* 109 La. 570, 574, 33 So. 605); "the thing sought to be attained" (*Scarborough v. Smith,* 18 Kan. 399). These definitions given by the courts are in accord with the common understanding and use of the word "object."

The end sought to be accomplished by said chapter 193 was the creation of a fund to be used in connection with

the federal funds authorized by Congress in the construction of highways upon certain conditions to be complied with by the state, and also to be used in co-operation with the various counties and highway districts of the state in accordance with existing laws and, under certain contingencies, for the construction or completion of such state highways as should be deemed for the best interests of the state. This object or purpose is distinctly set out in said act as required by the constitution. We therefore hold that chapter 193, Session Laws 1919, is constitutional and became valid when it was adopted by a majority vote of the people of the state at the last election.

In support of his demurrer the defendant contends that the act of the sixteenth session of the legislature in effect attempts to amend, after its approval by the people, said chapter 193, by indirectly authorizing an increase in the rate of interest to a rate exceeding five per cent per annum or by authorizing a sale of said bonds at less than par.

Article 8, section 1 of the constitution of Idaho, so far as it is applicable to this case, reads as follows:

"The legislature shall not in any manner create any debt or debts, liability or liabilities, which shall singly or in the aggregate, . . . . exceed in the aggregate the sum of two million dollars, . . . . unless the same be authorized by law, for some single object or work to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest on such debt or liability as it falls due, and also for the payment and discharge of the principal of such debt or liability within twenty years of the time of the contracting thereof, and shall be irrepealable until the principal and interest thereon shall be paid and discharged. But no such law shall take effect until at a general election it shall have been submitted to the people, and shall have received a majority of all the votes cast for or against it at such election, and all moneys raised by the authority of such laws shall be applied only to specified objects therein stated or to the payment of the

debt thereby created, and such law shall be published in at least one newspaper in each county, or city and county, if one be published therein, throughout the state for three months next preceding the election at which it is submitted to the people. The legislature may at any time after the approval of such law, by the people, if no debts shall have been contracted in pursuance thereof, repeal the same.''

The constitutional limit of indebtedness having been reached, the state legislature enacted chapter 193, Session Laws 1919, which reads in part as follows:

''Sec. 1. For the purpose of providing moneys to be used in paying for a portion of the cost of laying out, surveying and constructing a system of state highways in the state of Idaho a loan of $2,000,000 is hereby authorized to be negotiated upon the faith and credit of the state of Idaho.

''Sec. 2. The State Treasurer is hereby authorized, empowered and directed to issue bonds of the state . . . . aggregating the amount of the loan authorized in section 1, which shall be known as Idaho state highway bonds, fourth issue. . . . . Such bonds shall bear interest at a rate which shall not exceed the rate of five per centum per annum. . . . .

''Sec. 12. The State Treasurer shall give two weeks' notice by publication in two newspapers of general circulation, one of which is published in the state of Idaho, of the intention of the state to sell the bonds authorized by the provisions of this act, and shall invite bids therefor. Said bonds must be sold at not less than the par value thereof, upon the best terms offered and at the lowest rate of interest named by any bidder. The state treasurer shall have the right to reject any and all of the bids offered and may readvertise for bids, as herein provided.''

This proposition was submitted to the people at the election held in November, 1920, and was adopted. An effort was made to sell the bonds so authorized, but no bidder was found who was willing to take them at par. Thereupon

the sixteenth session of the state legislature enacted Senate
Bill No. 319, Session Laws 1921, which reads in part as
follows:

"Section 1.   The State Treasurer of the State of Idaho
is hereby authorized, directed and empowered to employ for
and in behalf of the State of Idaho, a fiscal agent or broker
to procure or assist in procuring a bidder, at not less than
par and accrued interest, for the Idaho State Highway
Bonds, Fourth Issue, being the bonds referred to in Chap-
ter 193 of the Laws of the State of Idaho for the year
1919, when the same are offered for sale, pursuant to the
provisions of said Chapter 193.

"Sec. 2.   As payment and full compensation for such ser-
vices and expenses of such broker or fiscal agent in connec-
tion therewith, the state treasurer of the State of Idaho
is authorized and directed to expend such sum as he may
determine to be necessary, but not to exceed the sum of
$97,500 for the entire issue, and proportionately for any
part thereof; but no compensation, expenses or other sum
shall be paid to said broker or fiscal agent unless the bidder
procured by him shall actually purchase the whole or a part
of said bonds at a price of not less than par and accrued
interest, and then only coincident with delivery of said
bonds to such purchaser and payment therefor by him.
Payments made to said broker or fiscal agent shall be made
on claims approved by the State Treasurer as head of the
department or institution, as required by general law, and
passed upon and approved by the state board of examiners."

Said act further provides that the State Treasurer is
also authorized to pay, for expenses incurred by him in the
issuance and sale of said bonds, as distinguished from any
expenses incurred by or paid for said fiscal agent or broker,
the sum of $500, or so much thereof as may be necessary.

The sole question in this case is whether or not the legis-
lature of this state has authority to make an appropriation
such as is attempted in Senate Bill No. 319 in the sale of
bonds after their issuance has been authorized by a vote

of the people, when the act of the legislature authorizing such a vote provides that the bonds shall be sold at not less than par and shall bear interest at not more than five per cent per annum. The contention of the defendant is that the payment of this sum to a fiscal agent or broker for assistance in selling said bonds amounts upon the one hand to increasing the rate of interest, or upon the other to selling the said bonds below par.

We are not inclined to agree with this view. To do so would be to hold in effect that it was the intention of the legislature in prescribing the maximum rate of interest to be paid and the minimum price at which the bonds should be sold that such bonds should be sold either without any expense whatever to the state or that the price received for them should not only equal the par value of the bonds, but such additional sum as would cover the expense necessarily incurred in their issuance and sale. This view is not consistent with the act of legislation submitting this proposition to a vote of the people, nor with the subsequent act authorizing the employment of a fiscal agent. In the former act provision was made for the treasurer to advertise said bond issue in two newspapers of general 'circulation, one within and the other without the state, if the proposition to issue said bonds should be adopted, and it was also required, in obedience to the provision of the state constitution, that the entire act submitting said proposition, covering four and one-half pages of the Session Laws of 1919, should be published in at least one newspaper in every county of the state for a period of three months next preceding the election at which said proposition was submitted to the people. These expenditures alone involved an outlay of several thousand dollars. Under the latter act provision is made for the payment of the fiscal agent's commission and some expenses of the State Treasurer. In addition to these provisions for expenses in connection with the sale of said bonds, the act submitting the bond proposition to a vote of the people provided that: ''The expenses of printing

or lithographing and procuring suitable bonds with interest coupons attached, for the purpose of carrying out the provisions of this act, shall be paid out of the moneys arising from the sale thereof as an expense incident to the laying out, surveying and constructing of said system of state highways.'' (1919 Session Laws, 581.) No mention is made of any of these expenditures in connection with the par value of the bonds or the rate of interest they were to bear, so it is clear that it was not the intention of the legislature to require that these bonds should bring their face value over and above all expenses that might be incurred in connection with their issuance and sale. The fact is that, whether such expenses are great or small, they have nothing to do with determining the par value of the bonds or the rate of interest on them.

It is conceded that a *bona fide* attempt has been made by the state treasurer to dispose of these bonds according to the terms of chapter 193 of the 1919 Session Laws, and that such attempt has failed to bring a purchaser of said bonds at par and five per cent interest. This condition being known to the late legislature, suppose that body had determined that another effort should be made to sell said bonds, and that, instead of providing for the employment of a fiscal agent, in the hope of obtaining a large popular subscription to said bonds among the citizens of this state it had provided that the State Treasurer should advertise said bond issue for a certain period of time in every newspaper published in the state of Idaho, and that in addition to this effort to arouse a local interest in the purchase of these bonds he had been authorized to advertise said bonds in every daily newspaper and every financial publication published in the United States in a city of a population of one hundred thousand or more, and a large appropriation had been made for this additional advertising, it would hardly be said that such a measure was beyond the legislative power, and that by submitting said bond issue to a vote of the people, the legislature had so limited itself

that it was powerless to authorize the use of any additional means to effect a sale of these bonds. What difference in principle is there between such means and the means adopted by the late legislature in authorizing the employment of a fiscal agent? There is none. Then there is no objection from a legal standpoint to the method adopted by the legislature as to the employment of a fiscal agent. But the objection that is urged, it seems to us, grows out of a suspicion that under the guise of employing a fiscal agent and paying him a commission for services there may be an attempt on the part of the purchaser to obtain the commission and thus in effect make sale of the bonds at less than par, or, if at par, make them bear a higher rate of interest than that prescribed by the law. Clearly, to our minds, if the employment of a fiscal agent should develop into a subterfuge for the accomplishment of such a purpose as this, it would be a violation of the law, but we may not declare this provision invalid because of the fact that officers, if they were acting in bad faith, might permit something that is forbidden by the law. We must assume that the officers charged with the handling of this transaction will be honest and will act in good faith for the purpose of accomplishing the sale of these bonds according to the spirit as well as the letter of the law. The act providing for the appointment of a fiscal agent or broker gives ample power to the officers of this state to protect the state against such a transaction as seems to be feared. This act provides that, "No compensation, expenses or other sum shall be paid to said broker or fiscal agent unless the bidder procured by him shall actually purchase the whole or a part of said bonds at a price of not less than par and accrued interest, and then only coincident with delivery of said bonds to such purchaser and payment therefor by him. Payment made to said broker or fiscal agent shall be made on claims approved by the State Treasurer as head of the department or institution, as required by general law, and passed upon and approved by the state board of examiners."

It will thus be seen that until the bonds are actually sold and paid for, such broker or fiscal agent would not be entitled to payment of such allowance as might be agreed upon between him and the state treasurer, and if it should appear that the transaction was one by which the purchaser of the bonds was directly or indirectly to receive the benefit of the commission allowed to the fiscal agent, it would not only be within the power, but it would be the duty, of the officers of this state having to do with the allowance of said claim to reject it, and we must assume that said officers will act in the interest of the state of Idaho, and will use all diligence to prevent the accomplishment of any such unlawful purpose, if it should be attempted.

It would seem, also, that the defendant bases his objection in part upon the assumption that in no event could a sale of said bonds be made above par, or at a premium. While it may be admitted that probably a sale might not be made above par just at this time, this court cannot assume as a matter of law that a sale cannot be so made, either now or at any time in the future.

While these reasons seem to us sufficient to warrant the holding of this act valid as to the appointment and payment of a fiscal agent or broker, it may be well to cite a few decisions of other courts in which similar questions have been passed upon.

The defendant has cited a number of cases in which courts have held that under a provision for the sale of bonds at not less than par a commission to a broker or fiscal agent which was found to be claimed in the interest of the purchaser of the bonds could not legally be paid, for the reason that such a transaction amounted to a sale of such bonds at less than par. We think there can be no question that this holding is correct, and, as we said above, if it should be found in this case that the purchaser was to receive any commission allowed to a broker or fiscal agent, no legal payment of such commission could be made to such broker or fiscal agent, or to any person for him.

In *Armstrong v. Ft. Edwards,* 159 N. Y. 315, 53 N. E. 1116, *Manitou v. First Nat. Bank,* 37 Colo. 344, 86 Pac. 75, *Davis v. City of San Antonio* (Tex. Civ.), 160 S. W. 1161, *Miller v. Park City,* 126 Tenn. 427, Ann. Cas. 1913E, 83, 150 S. W. 90, the implied authority of cities to pay a commission for the sale of bonds under a provision of law requiring that such sale should be made at not less than par has been upheld, and sales under such conditions have been held not to have been made below par.

In *Miller v. Park City, supra,* in upholding a sale as not below par when the commission was paid out of the proceeds of the bond sale, the court said: "It is needless to say that if charges of this kind are sought to be made the cover for an actual sale at less than par, or if they are grossly unreasonable and attended by marks of bad faith, the court would not hesitate to declare such transaction fraudulent and void." And this appears to be the universal holding of the courts upon this point.

In the case of *Mayor etc. of New York v. Sands,* 105 N. Y. 210, 11 N. E. 820, in discussing the implied power of the controller to employ an agent and pay him a commission of one-half of one per cent in making sale of $15,000,000 of bonds which resulted in the payment of a premium of four and one-half per cent on said bond sale, the court said: "It is a matter of common knowledge that such loans, in all countries of the world, are usually negotiated through agencies outside of the regular financial authorities of the government making the loans." And the court calls attention to the fact that during the Civil War the federal government used such agencies in raising the large sums that were required by the government during that period, and that without such assistance it would have been difficult, if not impossible, to effect the desired loans.

And in the same case the court further says: "The necessity of incurring some expenses in the negotiation of loans and placing the bonds authorized to be issued is, in view of the universal practice in such cases, too plain to admit of

dispute, and it is obvious that, unless the controller was vested with power to pay them, the whole purpose of the act might be defeated at its outset.''

The supreme court of Minnesota in the case of *State v. West Duluth Land Co.,* 75 Minn. 456, at page 467, 78 N. W. 115, 117, said: ''Under the provisions of sec. 4, chapter 289, *supra,* a sale of the bonds issued thereunder at less than par value was forbidden. The bonds now under consideration, $140,000 in amount, were turned over to a broker for sale under a written contract with the board of county commissioners. In this contract, it was stipulated that the broker should pay· for lithographing and printing the blank bonds, for legal advice and services, and all other expenses incident to a sale, for which, and as compensation in full, he was to receive the sum of $14,000, 10 per cent of the face value of the bonds sold. On these facts we are asked to hold that there was a plain violation of sec. 4, and that the bonds are void. There might be cases where the facts very conclusively show that an agreed compensation of ten per cent for the sale of the bonds was a palpable evasion of such section, but we have no such case before us. We cannot say, as a matter of law, that, under the conditions of this contract, there was a violation of sec. 4, which forbids a sale of the bonds at less than par.''

The case most nearly in point to which our attention has been directed is one decided by the supreme court of Missouri, in which it was held that the board of fund commissioners of that state, which was authorized to issue and sell three and a half million dollars of state bonds at not less than par, had implied power to employ a broker and pay him a commission out of the proceeds of said bonds for his services in making sale thereof at not less than par. In that case the court said:

''The question therefore is: Can a contract to pay a commission for procuring purchasers for these bonds be made by the board? We think so. First, it is a conceded fact that the defendants have tried to find purchasers and have

failed. This might have been expected owing to the exceed-ingly low rate of interest (3½ per cent) which the bonds bear, and owing to the further fact that the members of such board are not in position to find purchasers, as would be some established brokerage company, with a clientele all over the country. Such boards are not usually in touch with the great mass of persons who invest in such securities. A large issue of bonds of this character might be sold to the clientele of any large brokerage firm, in small quanti-ties to each client. Such companies usually have and can find persons among their customers who could be easily induced to take one or more of such bonds even at a low rate of interest, but this would require work. What a brokerage firm could do in this way, the usual board charged with the sale of low rate bonds could not do.

"We are therefore of opinion . . . . (5) that under such facts there is, from the legislative acts, *supra,* a clearly implied power which authorizes such board to enter into a contract with some financial agent to procure for such board a purchaser or purchasers who will take such bonds at their par value, and in such contract to agree to pay and pay such agent, out of the proceeds of the sale, a reasonable com-mission for the services rendered." (*Church v. Hadley,* 240 Mo. 680, 145 S. W. 8, 39 L. R. A., N. S., 248.)

"Except as limited by constitutional provisions, the legis-lature has absolute control over the finances of the state; and its power as to the creation of indebtedness or the ex-penditure of state funds, or making appropriations, is plen-ary, and the exercise of this power cannot be controlled or reviewed by the courts. The legislature is, however, bound by all constitutional limitations, although in determining whether the conditions or contingencies specified in the con-stitution as justifying the contraction of a debt or the mak-ing of an appropriation exist, the legislature has large dis-cretion, and its action is not subject to judicial control unless such discretion has been plainly abused." (36 Cyc. 882.)

"Power of a municipality to issue and sell bonds carries with it the implied power to secure such reasonable and necessary assistance as may be requisite to bring about an advantageous sale and to this end the municipality acting in good faith may employ a broker regularly engaged in the business. And its power is not confined to the employment of a broker only. It may employ any person, although not a regular broker, that the municipality may in good faith consider able to assist it in selling and disposing of the bonds." (2 Dillon, Municipal Corporations, sec. 895.)

In the case at bar it is not a question of implied power of the State Treasurer to employ a broker or fiscal agent; that power is expressly conferred upon him by the act of the late legislature known as Senate Bill No. 319. We think there can be no question as to the power of the legislature to adopt this plan in aid of the sale of said bond issue and to make the necessary appropriation therefor, and therefore hold said act not in conflict with the constitution of this state. We also hold that the payment of such commission would not reduce the selling price of said bonds below par nor raise the interest rate on said bonds above five per cent.

While we hold Senate Bill No. 319 to be a valid act of the state legislature requiring the State Treasurer to employ a fiscal agent or broker to assist in making sale of said bond issue, if he shall find that it cannot be sold without incurring such expense, we think some degree of discretion is given to said Treasurer as to the exact time when it shall be necessary, if at all, to employ the services of such fiscal agent or broker, for manifestly it would be unreasonable to hold that, if it appeared to the Treasurer possible to make such sale without incurring this expense, he would still be required to proceed at once to the employment of a fiscal agent and thus incur an expense that could reasonably be avoided. Since it does not appear from the petition that said Treasurer will not proceed as directed by said Senate Bill No. 319, after he shall be satisfied that a sale

cannot be made otherwise, and after he has been satisfied that he can proceed legally under said Senate Bill No. 319, and since it does not appear from said petition that a sale can be made even with the aid of a fiscal agent or broker, the demurrer should be and is hereby sustained. The alternative writ should be quashed and the peremptory writ denied. It is so ordered.

Rice, C. J., and Budge and McCarthy, JJ., concur.

LEE, J., Dissenting.—I cannot concur in the majority opinion. It is admitted that the bonded indebtedness of the state, which the legislature was authorized to create under the limitations placed upon it by article 8, section 1, of the constitution, had reached the maximum amount which it could create without submitting the proposal for additional bonded indebtedness to a referendum vote of the people, when the 15th Session of the legislature enacted chap. 193, L. 1919, p. 578. This provision of the constitution authorizes the legislature to submit a proposal for additional bonded indebtedness for two purposes: First, "in case of war, to repel an invasion, or suppress an insurrection," and, secondly, "for some single object or work to be distinctly specified." The 15th Session authorized the submission of a proposal to issue $2,000,000 of twenty-year five per cent road bonds, which should be sold for not less than par, to a referendum vote, and this proposal was submitted and approved at the November, 1920, general election. It is now claimed that because of the changed financial conditions, these bonds cannot, at this time, be sold at par and for the maximum rate of interest fixed in the proposal. Accordingly, the 16th Session, by chap. 61, L. 1921, directed the State Treasurer to employ a fiscal agent or broker to procure or assist in procuring a bidder for these bonds, who will buy them at par and the maximum rate of interest, and this act appropriates $97,500 to compensate such broker or fiscal agent for his services in procuring such bidder. The legislative acts of both the 15th and 16th Sessions

above referred to should be considered and construed in con-
nection with said article 8, section 1, of the constitution,
because they are legislative enactments to carry out its pro-
visions in the matter of authorizing the state to increase
its bonded indebtedness. It is evident that the expenditure
of $97,500 directed to be made by the 16th Session for the
purpose of procuring a broker or fiscal agent who will secure
a purchaser for these bonds upon the terms which the ref-
erendum vote authorizes, results in doing that which the
original proposal authorized by the 15th Session did not
contemplate, and which it forbids, that is, the selling of
these bonds below par or at a higher rate of interest than
five per cent.

It will not be questioned that the legislature has absolute
control over the finances of the state, and that its power
over the creation of indebtedness or the expenditure of state
funds is plenary, and that the exercise of this power cannot
be controlled or reviewed by the courts, except as limited
by the constitution. But the legislature is bound by all
constitutional limitations, and where it exceeds such limita-
tions, its acts are subject to judicial control. (*Nougues v.
Douglass*, 7 Cal. 65; *In re Appropriations by the General
Assembly*, 13 Colo. 316, 22 Pac. 464.)

"Neither the legislature, nor the officers and agents of
the state, nor all combined, can create a debt or incur an
obligation for and on behalf of the state, except as to the
amount and in the manner provided for in the constitution."
(*People v. Supervisors*, 52 N. Y. 556, at 563; *People v. May*,
9 Colo. 80, 10 Pac. 641; *People v. Johnson*, 6 Cal. 499;
*Williams v. Louisiana*, 103 U. S. 645, 26 L. ed. 595, see, also,
Rose's U. S. Notes; Cooley on Constitutional Limitations,
76, 77.)

By said act of the 15th Session a definite, certain proposal
was submitted to the voters, which was, "Shall a bond issue
of $2,000,000 be authorized for the laying out, surveying
and constructing of state highways?" It further provides
for the payment of the bonds authorized to be issued under

said act, and the interest which should accrue thereon, according to its strict terms; that said bonds should be sold at not less than par, and upon the best terms offered, and at the lowest rate of interest named by any bidder; that the expense of printing or lithographing and securing suitable bonds, with interest coupons attached, for the purpose of carrying out the provisions of said act, should be paid out of the moneys raised from the sale thereof as an expense incident to the laying out, surveying and constructing of said system of highways; and that the act should be published in one newspaper in each county throughout the state for a period of three months next preceding the general election.

If the legislature, after having provided for the submission of a definite proposal of this kind, and after such proposal has been submitted and approved by a referendum vote, may at a subsequent session increase the amount of the indebtedness by a direct appropriation, under the pretense of making an appropriation to employ a fiscal agent to find a purchaser for said bonds, then the constitutional limitation as to the amount of such indebtedness and the manner of creating it is to all practical intents and purposes ineffectual. This provision of the constitution does not admit of any substantial change in the proposal to create additional indebtedness, after it has been approved and ratified by a referendum vote.

There is nothing in the act making the appropriation which forbids the purchaser from receiving this amount, if not directly, then it may be paid indirectly, as far as the terms of the act go under the claim of paying it as compensation to a fiscal agent. It must be apparent that this is only an indirect method of disposing of these bonds below par at a higher rate of interest than that fixed by the proposal as submitted and approved, and in effect nullifies the limitation placed upon the power of the legislature by the constitution. For this reason chap. 61, L. 1921, so far as it attempts to authorize an additional expenditure of $98,000 for the sale of this road bond issue, should be declared unconstitutional.