[No. 31724, 31725. *En Banc.* April 30, 1951.]

THE STATE OF WASHINGTON, *on the Relation of Smith Troy, as Attorney General, Plaintiff,* v. TOM MARTIN, *as State Treasurer, et al., Respondents.*[1]

*The Attorney General* and *Richard Thorgrimson, Special Assistant,* for relator.

*Lyle L. Iversen, Assistant Attorney General,* for respondents.

ROBINSON, J.—Both of the above entitled actions were instituted in this court on February 28, 1951, by the relator filing petitions for the issuance of original writs of mandate requiring the respondents, as members of the state finance committee, to refrain from issuing, offering for sale, or selling certain general obligation bonds of the state of Washington, or to show cause, if any they had, why they should not do so.

To the petition in cause No. 31724 there was attached an affidavit of the relator that he brought the action in his official capacity as attorney general for the purpose of de-

[1]Reported in 230 P. (2d) 601.

termining the right of the state finance committee to issue, offer for sale, and sell $40,000,000 of public school building general obligation bonds purported to have been authorized by Laws of 1949, chapter 229, p. .857, and subsequently ratified by the adoption of referendum bill No. 7 by a majority of the qualified electors of the state at the general election held on November 7, 1950.

It was further stated in the affidavit that, on February 16, 1951, the respondents, as members of the state finance committee, adopted a resolution providing for the issuance and sale of $40,000,000 of general obligation bonds, which, as aforesaid, were purportedly authorized by chapter 229, Laws of 1949, and ratified by the electors of the state at the general election of 1950, and that the resolution (a copy of which was attached to the petition as an exhibit) directed the secretary of the committee to offer the bonds for sale on March 15, 1951, by publication in the Daily Bond Buyer in the city of New York and in the Daily Journal of Commerce published in the city of Seattle. It was further averred that, unless prevented by this court, the respondents, as the state finance committee of the state of Washington, would immediately offer the bonds for sale and upon such sale would issue and deliver the same to the purchasers thereof in order to provide funds for the purposes set forth in chapter 229, Laws of 1949. It was further alleged:

"That said resolution of the respondents as the State Finance Committee of the State of Washington and their intention to sell and deliver said bonds to the purchasers thereof as provided in said resolution are contrary to law in that Chapter 229, Laws 1949, under which said respondents purport to act, is in violation of that provision of Section 3, Article VIII of the Constitution of the State of Washington providing that no indebtedness of the State may be incurred unless such debt shall be authorized by law for some single work or object to be distinctly specified in the legislative Act."

On the same day the petition in cause No. 31724 was filed, the chief justice of this court signed an order presented to him by a *"special* assistant attorney general," acting as at-

torney for relator. We quote the pertinent portions of the order:

"IT IS, THEREFORE, ORDERED that the respondents above named, as the State Finance Committee of the State of Washington, show cause in this Court, sitting en banc, on the 19th day of March, 1951, at 9:00 o'clock A. M., or as soon thereafter as counsel may be heard, why a writ of mandate should not issue herein as prayed for and demanded in said application.

"IT IS FURTHER ORDERED that until the further order of this Court, respondents as such State Finance Committee refrain from offering the $40,000,000 of public school building construction general obligation bonds of the State of Washington for sale."

Cause No. 31725 is very similar to cause No. 31724, although it questions the validity of a different bond issue, which was also provided for by the legislature in its 1949 session by the enactment of chapter 230, p. 860. Section 1 of that act stated its purpose as follows:

"Section 1. For the purpose of providing needful buildings at the state operated charitable, educational and penal institutions presently operated by the Department of Public Institutions, the State Finance Committee is hereby authorized to issue, at any time prior to January 1, 1960, general obligation bonds of the State of Washington in the sum of twenty million dollars ($20,000,000), or so much thereof as shall be required to finance the program herein set out, to be paid and discharged within twenty (20) years of the date of issuance."

Section 7 of the act provided that the act should be submitted to the people for their adoption and ratification, or rejection, at the state general election to be held on the Tuesday next succeeding the first Monday in November, 1950.

The act was submitted to the people at the general election on November 7, 1950, as referendum bill No. 8, under the following ballot title:

"AN ACT providing for the issuance and sale of state general obligation bonds up to twenty million dollars for the purpose of providing buildings at the state operated charitable, educational and penal institutions."

It was ratified by a majority vote.

To his petition in cause No. 31725 the relator attached an affidavit, very similar to that which he attached to his petition in cause No. 31724, stressing his claim that chapter 230, Laws of 1949, violated that portion of the first sentence of § 3 of Art. VIII of the constitution, which we will italicize in quoting the sentence:

"Except the debt specified in sections one and two of this article, *no debts shall hereafter be contracted by or on behalf of this state, unless such debt shall be authorized by law for some single work or object to be distinctly specified therein,* which law shall provide ways and means, exclusive of loans, for the payment of the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty years from the time of the contracting thereof. . . ."

In both causes the respondents filed returns, alleging that the bonds provided for in, and authorized by, chapters 229 and 230, Laws of 1949, were, in each chapter, authorized for an object distinctly specified therein. As hereinbefore noted, the respondents were ordered to show cause in this court on March 19, 1951, why the writs of mandate should not be issued as prayed for in the petitions in causes Nos. 31724 and 31725. On March 5, 1951, the attorneys for relator and the attorney for the respondents stipulated that causes Nos. 31724 and 31725 might be consolidated for hearing, and the briefs submitted in the two actions might also be consolidated; whereupon the chief justice immediately entered an order consolidating the causes for hearing, and they were so heard on March 19, 1951.

In due course, consolidated briefs were filed on behalf of the relator and on behalf of the respondents. The briefs on behalf of the relator were signed by the relator and by a "*special* assistant attorney general," who, we may properly take judicial notice, is rightly regarded in legal circles as a specialist as to questions of law arising in the issuance and sale of bonds.

Both briefs stated that the question involved in each of the consolidated cases was whether or not the bonds ques-

tioned therein were for an object distinctly specified in the act, within the meaning of § 3, Art. VIII, of the state constitution. The briefs were not very controversial. In fact, they cited and relied upon substantially the same cases and authorities, and, as we understand them, arrived at about the same .conclusion. Under the caption "Summary," it was said, in the brief of respondents:

"Both Referendum Measure No. 7 and Referendum Measure No. 8 are for the financing of an integrated state program. The requirement of section 3, Article VIII of the State Constitution that an indebtedness must be for a single work or object specified in the law is fully met in each case."

No reply briefs were filed on behalf of the relator, nor did he or his *special* assistant attorney general attempt to refute, in oral argument, the summary in respondents' brief, perhaps because they had said, in their opening brief:

"The decisions discussed in this brief indicate that the courts of New York, Pennsylvania and Montana have construed constitutional provisions similar to Article VIII, Section 3 of our Constitution so as to render invalid the creation of state indebtedness under circumstances somewhat analogous to those found in Chapters 229 and 230, Laws of 1949. The effect of these decisions has been to create a doubt as to the validity of such acts which would make difficult, if not impossible, the sale of any bonds which might be issued pursuant thereto. It is, therefore, submitted that a decision by this court is necessary to determine the constitutionality of said Acts and the right of the State to issue and sell the bonds authorized thereunder."

That came very near to requesting this court to hold chapters 229 and 230, Laws of 1949, to be constitutional, as contended by the assistant attorney general representing the respondents.

It was also said, on page ten of relator's brief:

"It is conceded by the relator that the doubt concerning the validity of Chapter 229, authorizing the issuance of the $40,000,000 of general obligation bonds for state assistance to the public school districts, is less then the doubt concerning the validity of Chapter 230, authorizing the issuance of $20,000,000 of institutional building bonds."

The relator and his "special assistant" also conceded, in their brief, that the general principles which this court has adopted in the construction of the constitution, in so far as such construction involves the validity of legislative enactments, are fully and ably set forth in the court's decisions in the cases of *Gruen v. State Tax Commission,* 35 Wn. (2d) 1, 211 P. (2d) 651, and *Gottstein v. Lister,* 88 Wash. 462, 153 Pac. 595. In so stating, they undoubtedly had in mind the following statement in the *Gruen* opinion:

"In construing a statute, every reasonable intendment will be indulged in in favor of the construction that it is in conformity with the provisions of the constitution. If a reasonable doubt appears, it should be resolved in favor of the validity of the law, the presumption being 'that the statute in question is constitutional,' and the burden rests upon the attacking party to clearly establish its invalidity." (p. 6.)

We think it unnecessary to invoke that rule in the instant causes, since we are of the opinion that it clearly appears, on the faces of chapters 229 and 230, Laws of 1949, that each of them met the requirements of § 3 of Art. VIII of the state constitution, by distinctly specifying, in the legislative titles, in the referendum titles, and in the body of the acts, the object for which the bonds provided for were authorized. We agree with the relator and his special assistant that this is more obvious in chapter 229 authorizing the issuance of the $40,000,000 school bonds than it is in chapter 230. The purpose of authorizing those bonds is certainly distinctly specified in chapter 229. We partially requote § 1 of that act:

*"For the purpose of furnishing funds for state assistance in providing public school plant facilities under the provisions of chapter 278, Laws of 1947,* the State Finance Committee is hereby authorized to issue, at any time prior to January 1, 1960, general obligation bonds of the State of Washington in the sum of forty million dollars ($40,000,-000), or so much thereof as shall be required to finance the program herein set out, to be paid and discharged within twenty (20) years of the date of issuance." (Italics ours.)

The object of chapter 229, Laws of 1949, was, therefore, distinctly specified therein, as required by § 3 of Art. VIII of the state constitution.

It is undisputable that the object of chapter 229, Laws of 1949, was to furnish funds for state assistance in providing public school plant facilities under the provisions of chapter 278, Laws of 1947. The short title of that act was: "STATE ASSISTANCE TO SCHOOL DISTRICTS." That chapter is a very comprehensive act. It contained a very elaborate formula for the determination of the amount of state financial assistance to school districts, and further provided that, if need be established, additional state assistance might be afforded, if found necessary by the state superintendent of public instruction in order to meet a school housing emergency resulting from the destruction of a school building by fire, the condemnation of a school building by properly constituted authorities, a sudden and excessive increase in school population, and other conditions similarly emergent in nature.

It directed the superintendent of public instruction, in consultation with the state department of health, to prepare a manual for the information and guidance of local school district authorities and others responsible for the designing, planning, maintaining, and operation of school plant facilities for the common schools.

It also directed the superintendent of public instruction to furnish school districts consultatory and advisory service in connection with the development of school building programs and the planning of school plant facilities. Many other things, relevant to the object to be attained, were required of the state superintendent of public instruction. In any event, those duties would have fallen upon the state superintendent of public instruction; for the school code of 1909, which created that office, read, in part (Laws of 1909, chapter 97, p. 231, § 3):

"Sec. 3. The powers and duties of the Superintendent of Public Instruction shall be:

"*First.* To have supervision over all matters pertaining to the public schools of the state."

That statutory provision has not been repealed or amended, and is currently codified in Rem. Rev. Stat., § 4523, followed by a list of eighteen other powers and duties expressly assigned to the superintendent in § 3, chapter 97, Laws of 1909.

We hold that chapter 229, Laws of 1949, authorizing the issuance and sale of $40,000,000 of general obligation bonds, authorized the bonds for a single object, distinctly specified therein, and, therefore, did not violate § 3 of Art. VIII of the constitution of the state of Washington.

The question remaining is: Does chapter 230, Laws of 1949, authorizing the issuance and sale of $20,000,000 of general obligation bonds, authorize them for a single object, distinctly specified therein, as required by § 3 of Art. VIII of the state constitution?

The legislative title of chapter 230 read as follows:

"PROVIDING FUNDS FOR BUILDINGS AT STATE OPERATED INSTITUTIONS:

"AN ACT providing funds for the construction of needful buildings at the state operated charitable, educational and penal institutions; authorizing the issuance and sale of state general obligation bonds and providing ways and means to pay said bonds; making an appropriation; providing for submission of this act to a vote of the people, and declaring an emergency."

Sections 1 and 3 of the act read as follows:

"Section 1. For the purpose of providing needful buildings at the state operated charitable, educational and penal institutions presently operated by the Department of Public Institutions, the State Finance Committee is hereby authorized to issue, at any time prior to January 1, 1960, general obligation bonds of the State of Washington in the sum of twenty million dollars ($20,000,000), or so much thereof as shall be required to finance the program herein set out, to be paid and discharged within twenty (20) years of the date of issuance.

"Sec. 3. The sum of twenty million dollars ($20,000,000), or so much thereof as may be necessary, is appropriated from the Institutional Building Construction Fund to the State Finance Committee to be expended by the Committee for the payment of expense incident to the sale and issuance

of the bonds authorized herein and through allotments made, in its discretion, to the Director of Public Institutions for the purpose of constructing needful buildings at the state operated charitable, educational and penal institutions."

The act also provided, in its § 7, that it should be submitted to the people for their adoption and ratification, or rejection, at the general election to be held in November, 1950. It was so submitted as referendum bill No. 8, under the following ballot title:

"AN ACT providing for the issuance and sale of state general obligation bonds up to twenty million dollars for the purpose of providing buildings at the state operated charitable, educational and penal institutions."

It was adopted and ratified by a majority vote.

Among the many cases cited, the one most nearly in point on the question raised in cause No. 31725 is *State ex rel. Davis v. Banks*, 33 Idaho 765, 198 Pac. 472, although, in that case, a writ was sought to mandate the state treasurer to sell bonds, while, in the case before us, the writ of mandate is sought to prevent the respondents from selling the bonds involved. It appears in the Idaho case that chapter 193 of the 1919 Laws of Idaho directed the state treasurer to sell a series of state bonds of the par value of $2,000,000, to be known as Idaho state highway bonds, if subsequently approved by the people at the next general election; and they were so approved, and the treasurer, some few months thereafter, invited bids for the bonds and but five bids were received, the highest of which was below the par value of the bonds. Whereupon the state of Idaho, on relation of its governor, attorney general, and commissioner of public works, petitioned the state supreme court for a writ of mandate, directed to Banks, as state treasurer, to procure, or assist in procuring, a bidder for the Idaho state highway bonds, and direct him, if he could not sell the bonds, to employ a fiscal agent or broker to sell them.

The defendant treasurer filed an answer in which he urged that chapter 193 was unconstitutional and void, on the ground that the purposes specified in chapter 193 as the

purpose of the issuance of the bonds and the creation of the indebtedness therein referred to are not distinctly specified in chapter 193, in that neither the extent, mileage, location, general character, or termini of the highways to be completed or constructed are set forth, nor do they constitute some single object or work. With reference to those contentions, the court said:

"The constitutional provision referred to above, article 8, sec. 1, prohibits the creation of the indebtedness provided for in chapter 193, Session Laws 1919, 'unless the same shall be authorized by law, for some single object or work, to be distinctly specified therein.' The word 'object' is defined as 'the end aimed at; the thing sought to be accomplished' (*Paxton v. Baum,* 59 Miss. 531, 536); 'the aim or purpose' (*State v. De Hart,* 109 La. 570, 574, 33 So. 605); 'the thing sought to be attained' (*Scarborough v. Smith,* 18 Kan. 399). These definitions given by the courts are in accord with the common understanding and use of the word 'object.'

"The end sought to be accomplished by said chapter 193 was the creation of a fund to be used in connection with the federal funds authorized by Congress in the construction of highways upon certain conditions to be complied with by the state, and also to be used in co-operation with the various counties and highway districts of the state in accordance with existing laws and, under certain contingencies, for the construction or completion of such state highways as should be deemed for the best interests of the state. This object or purpose is distinctly set out in said act as required by the constitution. We therefore hold that chapter 193, Session Laws 1919, is constitutional and became valid when it was adopted by a majority vote of the people of the state at the last election."

As we have hereinbefore demonstrated by quotations from the legislative title of chapter 230, Laws of 1949, and the ballot title of the act when submitted to the vote of the people as referendum bill No. 8, the object of authorizing the bond issue provided for in chapter 230 was distinctly specified to provide funds for the construction of needful buildings at the state operated charitable, educational, and penal institutions, and we are of the opinion that that object was distinctly specified in § 1 of the chapter, as follows:

"Section 1. *For the purpose of providing needful buildings at the state operated charitable, educational and penal institutions presently operated by the Department of Public Institutions,* the State Finance Committee is hereby authorized to issue, at any time prior to January 1, 1960, general obligation bonds of the State of Washington in the sum of twenty million dollars ($20,000,000), or so much thereof as shall be required to finance the program herein set out, to be paid and discharged within twenty (20) years of the date of issuance." (Italics ours.)

On examining a copy of the second biennial report of the department of public institutions covering the period beginning October 1, 1948, and ending September 30, 1950, which report was filed as an exhibit by the respondents in their return, we find that, at the times chapter 230 was enacted by the legislature, approved by the governor, and ratified by a majority of the electors as referendum bill No. 8, the department of public institutions was operating thirteen charitable, educational, and penal institutions. We do not think it necessary to specifically list the institutions. It will be sufficient for our present purposes to say that two of the institutions so operated are penal institutions, three are state hospitals for the care and treatment of persons mentally ill, one is for the care and training of mentally defective children, two are operated for the rehabilitation and education of juvenile delinquents, two are operated to provide care for needy veterans, their wives, and widows, and one is operated for the education of children with hearing so impaired that they could not attend the public schools. The department also operates a school for the education and training of visually handicapped children.

It is pointed out, in the biennial report of the department of public institutions above mentioned, that the buildings of quite a number of those institutions were constructed during territorial days, and have greatly deteriorated, and also that a number of buildings of the institutions operated on the west side of the state were very severely damaged by the April, 1949, earthquake, and it is stated that, in some instances, new buildings are required in order to carry on the functions of the institutions.

The over-all object of the act, as specifically stated therein, is clearly consistent with the thought, desire, and mandate of the founding fathers, as expressed in Art. XIII of the constitution, entitled, "State Institutions." We quote the first sentence of § 1 of that article:

"ARTICLE XIII

"State Institutions

"§ 1. EDUCATIONAL, REFORMATORY AND PENAL INSTITUTIONS.—Educational, reformatory, and penal institutions, those for the benefit of blind, deaf, dumb, or otherwise defective youth, for the insane or idiotic, and such other institutions as the public good may require, shall be fostered and supported by the state, subject to such regulations as may be provided by law. . . ."

It seems clear to us that the ultimate object of chapter 230, Laws of 1949, was to raise funds to foster and support educational, reformatory, and penal institutions, those for the benefit of blind, deaf, dumb, or otherwise defective youth, and other institutions as the public good requires, and that that object was sufficiently specified therein. In our opinion, chapter 230, Laws of 1949, does not violate any provision of the constitution.

For the foregoing reasons, this court will not further restrain the respondents from issuing and selling the bonds provided for in chapters 229 and 230, Laws of 1949; and causes Nos. 31724 and 31725 are hereby dismissed. It is so ordered.

ALL CONCUR.